## ST. JOSEPH AND ST. LOUIS RAILROAD COMPANY *v.* HUMPHREYS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 287. Argued and submitted April 12, 1892. — Decided April 25, 1892.

Following *Quincy, Missouri & Pacific Railroad Co.* v. *Humphreys, ante,* 82, it is, with regard to the lease of the St. Joseph and St. Louis Railroad Company by the Wabash Company, now *Held,*

(1) That, the circumstances in the latter case being similar to those in the former, the receivers were entitled to a reasonable time to ascertain the situation of the leased railroad before they could be held to have assumed the lease;

(2) That the time taken by them in deciding not to assume it was a reasonable time;

(3) That the course pursued by the court below towards the various independent roads which made up the Wabash system was equitable and just and will not be disturbed in this case.

THE court stated the case as follows:

June 1, 1874, the St. Joseph and St. Louis Railroad Company leased its road to the St. Louis, Kansas City and Northern Railroad Company for the full term of ninety-nine years. The lessee agreed to pay the lessor on the first days of March and September in each year, as a rental, thirty per cent of the gross earnings of said line, and it also agreed that such percentage should not be in any one year less than $20,000; and agreed to pay all taxes, and put the road in good running

order and keep it in good condition during the whole of said term. The lease also contained the following provision :

"But in case default shall be made by the party of the second part in the payment of the rents herein reserved and the same or any part thereof shall remain unpaid for the space of thirty days from and after the day when the same shall become due and payable, or if said party of the second part shall fail to comply with its covenants to pay taxes aforesaid or in all things keep and observe all and every the covenants, stipulations, and agreements herein contained and on its part to be observed and kept, then it shall be lawful for the said party of the first part to enter upon and take possession of all the property hereby leased, together with all the improvements thereon constructed, and to have again, repossess and enjoy the same as in the first instance, and upon such default in the payments of rent or taxes or the breach of any such covenants as aforesaid this lease shall cease, terminate, and be forfeited, at the option of the party of the first part."

The St. Louis Company took possession of the leased line and operated it until November, 1879, at which time that company consolidated with the Wabash Railway Company, the consolidated company taking the name of the Wabash, St. Louis and Pacific Railway Company. On the first of June, 1880, the Wabash Company executed to the Central Trust Company of New York and James Cheney a mortgage on its entire system to secure what were known as its general mortgage bonds, of which seventeen millions of dollars were issued, and subsequently a mortgage to the Iron Mountain Company to indemnify that company for certain advances; and also a collateral trust mortgage. On May 27, 1884, the Wabash Company filed in the Circuit Court of the United States for the Eastern District of Missouri its bill of complaint, which has already been sufficiently set forth in the preceding case, No. 223, *Quincy &c. Railroad* v. *Humphreys, ante*, 82, and upon the filing of which receivers were appointed as therein detailed.

On June 15, 1884, the Wabash Company filed by leave of court an amended bill of complaint, setting forth with greater

particularity the various lines of railway belonging to its system; the liens and incumbrances thereon; and the financial condition of the company; and stating the lease between the St. Joseph Company and the St. Louis, Kansas City and Northern Railway Company; and the consolidation between the latter company and the Wabash Company.

On June 26, 1884, the receivers asked instructions from the court, but the St. Joseph Company is not mentioned in their petition of that date, nor in the master's report thereon. The petition states, however, that the Wabash Railway Company and the St. Louis, Kansas City and Northern were possessed of certain valuable lines of railroad, which were subject to mortgages and deeds of trust, and gives a list of them, not including the St. Joseph, and after excluding certain lines or divisions whose earnings had not theretofore been sufficient to pay operating expenses, cost of maintenance and interest, says that from the incoming rents and profits of the property now in their possession under the court's former order they believe they can, until otherwise directed, pay the expenses, cost and interest on bonds or other obligations secured by mortgages or deeds of trust on the lines or divisions that were owned or possessed either by the Wabash or by the St. Louis, Kansas City and Northern before their consolidation, which lines they thought would continue to yield sufficient to make such payments.

The order of appointment directed, among other things, that the receivers should pay rental on all leased lines, " out of the income that shall come into their hands from the operation of said railroad or otherwise," and "keep such accounts as may be necessary to show the source from which all such income and revenues shall be derived, with reference to the interests of all parties herein, and the expenditures by them made." By its confirmation of the master's report June 28, 1884, the court ordered the receivers to keep the accounts of the earnings and incomes from, as well as the accounts of, all the operating expenses, cost of maintenance and taxes of certain enumerated lines, not including the St. Joseph Company, separately, and report quarterly in respect thereto. On Sep-

tember 20, 1884, the court announced, upon an application for instructions with respect to payment of interest on that branch line of the Wabash system known as the Havana division, that the earnings belonging to other branches in the consolidated system would not be taken to support concerns that did not pay running expenses.

November 25, 1884, the St. Joseph Company filed its intervening petition, asking for the payment to it of rentals claimed to be due from the receivers, from March 1, 1884, to August 31, 1884, together with a penalty of one-tenth of one per cent a day as provided by the terms of the lease, and on January 2, 1885, filed its amended intervening petition, setting up the lease, the general mortgage and the indemnity mortgage, and charging violations by the Wabash Company of its covenants in respect of payment of taxes, keeping up repairs, etc., etc.

The petition further averred the filing of the bill and the appointment of the receivers, and that "said receivers are now using and operating said road and have recognized and adopted said lease and have elected to enter thereunder upon the premises therein demised and to avail themselves of the powers, privileges, and rights therein conferred on said lessee."

Petitioner further stated that on the first day of September, 1884, there was due to it for rent $27,420.79, of which $11,441.14 had accrued during the time the receivers had been operating the road; and that the taxes for 1884 were unpaid. It was alleged upon belief that its road was "absolutely necessary to the proper and profitable operation of the said Wabash, St. Louis and Pacific Railway," and that it was "a most valuable feeder to the main line of the Wabash Company."

And, after various other averments, petitioner prayed that the court direct the receivers to pay the rent then accrued and unpaid, forthwith, together with the penalty, and the taxes for 1884; and that they immediately proceed to put the leased property in thorough repair; and for general relief.

On the 11th of February, 1885, the receivers filed a demur-

rer and amended answer to the intervening petition, and, the demurrer being overruled, further answered February 21, denying that they had recognized or adopted the lease or elected to enter thereunder upon the demised property. They denied that the St. Joseph road was in anywise necessary to the profitable operation of the Wabash railway, or was a valuable feeder to its main line. They asserted that from May 29, 1884, to November 30, 1884, inclusive, the deficit and loss occasioned by the operation of the St. Joseph road amounted to $51,180.09, and averred that it would be manifestly unjust and inequitable to require them to take the earnings and profits of other branches of the system and pay the same in discharge of the rents accruing to petitioner. They further alleged that the net benefit from the business derived from petitioner's road accruing to the other lines operated by the receivers was far less than the outlay, and prayed the advice of the court whether they should any longer continue in the occupation and operation of the road or adopt the lease or deliver the road over to the petitioner, and, in the event that the petitioner should refuse to receive it, whether they should abandon the road. On March 20, 1885, the receivers applied to the court for instructions with respect to the cancellation of the St. Joseph lease, and on that day the receivers filed a report which showed that for the period between May 29 and November 30, 1884, the expenses of the line, not including any charge for rental, had exceeded its earnings $52,118.83, and they gave notice to the St. Joseph road that on April 13, 1885, they would apply to the court for instructions concerning the cancellation of the lease and the surrender of the leased property.

On April 16, 1885, the court delivered the opinion which it directed to stand as an order, which has been set forth and referred to in the preceding case, No. 223. On April 27, 1885, the master to whom the petition of the St. Joseph Company had been referred reported that he found from the evidence that the operation of the St. Joseph road had been a burden to the rest of the property in charge of the receivers since their appointment, without reference to the rental charged, and that in all reasonable probability it would con-

tinue to be a burden if operated as theretofore for an indefinite period; that the road owned no rolling stock at the date of the lease; and that the court had not adopted the lease in its entirety, and was not bound to continue to operate the road and pay the rental. Exceptions having been filed, the master modified his report by adding thereto, as findings of fact: That the Wabash Company had, prior to the time the receivers took possession of it, failed and neglected to keep the St. Joseph road in repair according to the terms of the lease; that the outlays made by the receivers were extraordinary, and were caused in part by the failure of the lessee to keep the road in repair; that extraordinary outlays for many months and perhaps years would be required from the same cause; that part of the expenses incurred by the receivers was for repairs and betterments; that the necessity for these arose from the failure of the lessee to put and keep the road in the condition in which it was to be kept by the covenants of the lease; and there still existed from the same cause a necessity for further repairs and betterments. He further found that the gross earnings of petitioner's road had been decreased by reason of the failure of the lessee to keep and carry out the covenants; but that the evidence did not satisfy him that a compliance with the terms of the lease by the lessee and its successors, or the receivers, would at any time since the date of the lease have resulted in any profit from the operation of the road. And further, that from May 29, 1884, to January 31, 1885, the operating expenses of the road, without reference to the rental charges, were $177,612.01; that the gross earnings for the same period were $116,851.10; that from the evidence before him he was unable to say that the probable necessary expenses for operating the road and affording the same facilities for business would in the future be less than they were during the period named for the same months in the year; that the petitioner's road had been of no benefit to the entire system in the hands of the receivers; that the profits on the carriage of goods delivered to the main line by the petitioner's road had not equalled the losses incurred by the receivers in operating that road; and that the road was

neither necessary nor valuable to the Wabash system as a feeder.

A supplemental intervening petition was filed July 1, 1885, and the master made an additional report. From the evidence he found that for the six months ending March 1, 1885, the operating expenses of the road exceeded its gross earnings by more than $42,000; and that the gross earnings of the rest of the system under the charge of the receivers realized from business originating on petitioner's road for the period above named were the sum of $94,646.01, of which, after deducting sixty per cent as the cost to the system of doing the business, there remained as net earnings realized from the system from business originating on that road, $37,858.40, or between four and five thousand dollars less than the direct loss incurred by the receivers in operating petitioner's road for the six months ending March 1, 1885. The master saw no ground, therefore, for changing his report by reason of the supplemental petition and the evidence introduced thereunder further than to add that there became due petitioner from the Wabash Company, on account of rental for the six months ending March 1, 1885, the sum of $28,572.37, which, in his opinion, should be allowed as a general, unsecured claim against the Wabash Company, with interest.

It appeared in evidence before the master that when the receivers took possession it was impossible, as the operating expenses of the St. Joseph line had never been kept separately, to form anything like an approximate estimate as to those expenses; that it was not until the end of August that it could be known what the earnings of this branch were in May; that, shortly after the first month's earnings and operating expenses were arrived at, parties connected with the St. Joseph road were notified that it was doubtful whether the road was making its operating expenses, and when the results of another month were arrived at, official notice was given that the rental would not be paid; and that this was in October, 1884. Exceptions were duly filed to this report.

April 9, 1886, the St. Joseph Company applied to the court for the possession of its road, and the court, at its instance,

thereupon made an order terminating the lease, and directing the receivers to surrender the road to that company, which order was complied with April 24, 1886.

The trustees in the general mortgage filed their cross-bill in the cause June 7, 1884, and, October 14, 1884, an amended cross-bill, praying for a foreclosure, and in January, 1885, an original bill in the state court, in which they prayed for substantially the same relief as in the cross-bills, which bill was removed into the Circuit Court and consolidated with the original suit. On April 16, 1885, the trustees moved for the appointment of receivers under the cross-bill, which application was denied. January 9, 1886, a decree of foreclosure and sale was entered, and the property covered by the decree was sold April 26, 1886, and the sale confirmed June 15. May 10, 1886, petitioner filed a second supplemental intervening petition, and in August and September, 1886, an application and amended application for payment of rentals down to April 24, 1886, out of the proceeds of the foreclosure sale. The amended application declared "that the said claim of your petitioner for the rent found by the master to be due to it under said lease constitutes, and in equity ought to constitute, a demand and lien against the proceeds of the sale of said Wabash, St. Louis and Pacific Railway Company under foreclosure; and, furthermore, that said claim is a lien prior in equity to any claim or lien of the complainants in this case or of any bondholders or mortgagees or other lessors or creditors of any kind or nature whatsoever." The receivers answered this second supplemental petition as follows:

"That it is not true that they, as receivers of the property of the Wabash, St. Louis and Pacific Railway Company, by any act of theirs or any order of the court by which they were appointed, adopted in whole or in part the covenants and obligations of the lease made by the said St. Joseph and St. Louis Railroad Company to the St. Louis, Kansas City and Northern Railway Company on or about the first day of June, 1874.

"These receivers, further answering, say that they did, pursuant to the order of this honorable court in that behalf duly entered, take charge of and operate the said St. Joseph and St.

Louis Railroad from and after the 29th day of May, 1884, until the 24th day of April, 1886, for the purpose of preserving said property and preventing a forfeiture of the charter thereof.

" Said receivers aver that at all times after they took charge of and commenced operating said St. Joseph and St. Louis Railroad they were compelled to expend large sums of money in the maintenance and operation thereof in excess of the earnings received therefrom.

" Said receivers, further answering, say that the said St. Joseph and St. Louis Railroad Company might at any time after the said property had been placed in their charge for the purposes aforesaid have obtained the possession thereof."

The preferred debt of the Wabash Company when the receivers were appointed was shown to have been $4,417,491; and the net earnings of the system from that date to April 24, 1886, to have been $2,819,131.40, leaving $1,598,359.60 outstanding. The master again reported a large deficit April 24, 1886, found the rentals due, and recommended their allowance as general, unsecured claims, with interest. The petitions, applications, reports and exceptions were heard, the exceptions overruled, and the petitions dismissed, and the petitioners appealed to this court.

*Mr. Everett W. Pattison* for appellant.

*Mr. Wells H. Blodgett* and *Mr. Thomas H. Hubbard* filed briefs for the appellees, and were present at the argument; but the court declined to hear them.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

We have already seen that the theory of this bill was that an insolvent railroad corporation may in the public interest, and for the benefit of all its various creditors, surrender its property to a court of equity, to be preserved and kept in operation until it can be disposed of according to the several private rights concerned. Under such circumstances, before receivers can be held to have adopted outstanding leases,

reasonable time is required to ascertain the situation, in order that the court may determine intelligently the proper course to be pursued. In this case as to many of the lines involved, it was presently known that they were not self-supporting and that fact was brought to the attention of the court, which announced that such roads could not share in the earnings of those which had a surplus, but that they might apply for possession. But as to the St. Joseph road, a somewhat longer time was necessarily taken to arrive at results in that regard. The court, however, from the first had permitted no doubt to be entertained as to its position in the premises. The order of appointment directed payment out of income only and required accounts to be kept of the source of income with reference to expenditure. The receivers, after ascertaining the earnings, expenses and cost of running the St. Joseph road, so as to be enabled to form a sufficiently correct judgment upon the matter, gave that company official notice that rental would not be paid. A loss was incurred by the operation of the road from May 29 to November 30, 1884, of more than $50,000. The master found that its operation was a burden to the rest of the property; that its expenses exceeded its earnings; that it was of no benefit to the system, and neither necessary nor valuable to it as a feeder; that the deficit June 30, 1885, was $71,207.36; and that the deficit continued until the road was surrendered by the receivers. This being so, the court was not bound to direct the receivers to adopt the lease and inflict a loss on the other roads, out of whose money or property alone these rentals could be paid.

We think the notice given by the receivers that they could not pay, if any notice were required, was given within a reasonable time; and that the St. Joseph Company has little cause to complain of any action taken in the premises. The Wabash Company was insolvent, and the St. Joseph could not get its rental because of that insolvency, but we are unable to perceive why that business loss should be made good to that company out of property in which others had superior rights. This is what in different forms constitutes petitioner's claim, namely, that either upon the ground of an election to adopt;

or of equitable lien; or that the rentals were part of the receiver's expenses; petitioner should be given a preference upon the corpus of the property.

We are of opinion in this case, as in No. 223, (*Quincy &c. Railroad Co.* v. *Humphreys, ante,* 82,) that these receivers did not become bound upon this lease by an election or because of any act of their own or of any order of court. We find here as there no reason to doubt that if petitioner had applied for the possession of this property earlier than it did, it would have obtained it. We do not agree to the view that the St. Joseph Company could lie idly by while the Wabash system was in the throes of dissolution, utterly insolvent and hopeless of recovery, and say that its inactivity was in reliance on an expectation held out by the receivers that the rental would be paid no matter what became of the rights of other parties. What fund was there, what assets were there, from which this rental could be paid? There was a preferential debt of more than four and a half millions, and at the time the St. Joseph Company retook its road the entire net earnings of the whole Wabash system, from May 29, 1884, to April 24, 1886, had not sufficed to extinguish that indebtedness by a million and a half, while the mortgaged property brought far less than the incumbrances.

What the court did was to allow lessors and mortgagees to get what they could out of their own property; and we find no assent by the mortgagees to the allowance of this claim as against them. It is true that in the answer of the Central Trust Company and James Cheney, trustees, to one of the intervening petitions, it is said that the receivers took possession of the property demised, and that "they have since that time held, used and operated said road in and by said lease demised, and under and by virtue thereof," but the action of the receivers or the orders of the court do not justify the conclusion, as we have said, that the lease was adopted, but the contrary. It is also true that some days after the receivers were appointed the Iron Mountain road appeared and assented to the appointment; but we do not regard that as materially affecting the situation.

Without more, what we have said in the preceding case is sufficient to dispose of this, and the decree of the Circuit Court is

*Affirmed.*