**WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO. et al.**

(Circuit Court of Appeals, Second Circuit. February 20, 1925.)

No. 156.

1. Receivers ⬩91—Relation to leased property stated.

A receiver appointed in a creditors' suit, who finds himself in possession of a leasehold estate, does not by possession become assignee of the term, but may become an assignee voluntarily, or he may so manage or mismanage the business committed to his charge as to be held in invitum to have adopted the lease.

2. Receivers ⬩91—Have reasonable time for adoption or rejection of lease.

A receiver always has a time, reasonable under the circumstances, wherein to decide whether the interests of his trust will be better served by adopting a lease or by rejecting it, which latter act implies a prompt return of the leasehold estate to the lessor.

**3. Receivers ⊂⊃91—Reasonable time for adoption or rejection of lease dependent on circumstances.**

The reasonable time for decision by a receiver whether to adopt or reject a lease, and promptitude in return of the property, if rejected, are both relative terms, relative to existing and always varying circumstances, and in respect of leased transportation systems operating under franchises the important circumstance is that the obligations of the carrier to the public must be fulfilled by the receiver, and the lessor's franchises must be preserved.

**4. Receivers ⊂⊃91—Provisional operation of leased property; rights of lessor.**

During the period of provisional operation of leased property by a receiver, the lease in no way governs the legal relation between receiver and lessor; but such relations are ruled by the equities of the situation, and ordinarily these equities will be satisfied by the receiver turning over to the lessor, should the lease be rejected, the net earnings acquired by him during the period of provisional operation.

**5. Receivers ⊂⊃91—Rejection of lease dates back to beginning of receivership.**

If a lease is rejected by a receiver at the end of a provisional period of operation, such rejection dates back to the beginning of the receivership.

**6. Receivers ⊂⊃91—If a receiver adopts a lease after provisional operation he must pay rental from beginning of receivership, and if he rejects must account from that time.**

If a receiver rejects a lease after a period of provisional operation, he must account from the beginning, as one who rejects; and if he assumes, he must from the beginning, conform to the contract he has assumed.

**7. Receivers ⊂⊃81—Receiver is operating the property for the court.**

A receiver operates the property, not for any one party, but for the court that appoints him, to which he is accountable.

**8. Street railroads ⊂⊃49—Receiver for lessee of street railroad, on disaffirmance of lease, held accountable to lessor for net profits of operation.**

The provisional operation of a street railroad by a receiver for the lessee *held* not for the benefit of the lessee, so long as he kept up payments of rental under the lease, where he later refused to make further payments and surrendered the property; nor did such payments create any special equity which takes the case out of the general rule that he is accountable to the lessor for the net profits of such operation from the beginning.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Westinghouse Electric & Manufacturing Company against the Brooklyn Rapid Transit Company and others. The Brooklyn City Railroad Company appeals from an order of the District Court. Modified and affirmed.

For opinion below, see 291 F. 836.

Appeal from final order confirming the report of Hon. E. Henry Lacombe, special master, and holding (1) Mr. Garrison, as receiver of the Brooklyn Heights Railroad Company (hereinafter called Heights Co.), did not operate the property of Brooklyn City Railroad Company (hereinafter called City Co.) and leased to Heights Co. for account of City Co. from July 15 to October 1, 1919, but did so operate the same for account of the lessee, Heights Co., wherefore said receiver is not accountable to City Co. for any earnings made by him from the operation of the leased property during the time stated. (2) Mr. Garrison did operate said property for account of City Co. only from October 1 to October 18, 1919, at which last date he surrendered the property and its operation to said City Co.

It is assigned for error in this order that the court refused to find that Mr. Garrison, as receiver aforesaid, was not obliged to pay City Co. "for the fair value of the use and occupation" of City Co.'s leased property during the period July 14 to October 19, 1919. Heights Co. became a defendant in the action above entitled, which is a creditors' suit affecting the corporations operating substantially all the surface car lines in the borough of Brooklyn. Heights Co. had but a small property of its own. City Co. owned nearly half the surface lines in the borough, but in 1893, as part of the wide-reaching centralization in operation effected by the Brooklyn Rapid Transit Company, City Co. leased its property and franchises to Heights Co. (controlled by B. R. T. Co.), by an agreement of which the following terms are here important:

(1) Heights Co. was to pay quarterly, on July, October, January, and April 1st, a sum that would pay 10 per cent. on the agreed capital stock of City Co., viz. $300,000 per quarter. (2) Also to pay as rent, and within a reasonable time after their due dates, all taxes, charges, and impositions lawfully laid on City Co. (3) City Co.'s right to re-enter for condition broken arose when any part of the rent remained unpaid for 60 days.

Mr. Garrison became receiver of Heights Co. on July 14, and began to operate the leased lines of that concern on July 15. From that date until September 15 he paid all charges, taxes, and other items of rent becoming both due and payable under

Heights Co.'s lease. On September 15 there fell due a quarter of the latter company's United States income tax for 1918. This pre-receivership obligation the receiver refused to pay, whereupon Heights Co. itself paid, and on September 25 served a demand on the receiver for the return or surrender of the leased property unless repayment was made by September 29. Thereupon, with the approval of the court below, the receiver refused to assume the lease as of midnight September 30, and turned over the leased property to City Co. as soon thereafter as was reasonably possible; i. e., on October 18.

Wm. N. Dykman, of Brooklyn, N. Y. (Sigourney B. Olney, of Brooklyn, N. Y., of counsel), for City Co.

Carl M. Owen, of New York City (D. A. Marsh, of Brooklyn, N. Y., of counsel), for Garrison, receiver.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). This appeal suggests points as to which this court has expressed opinion at length and laid down some legal principles. It is now urged that these principles, as applied below, produce what appellant calls a "grossly inequitable result." Some propositions underlying this or any similar matter may be briefly restated. They have been discussed sufficiently in the cases to be cited.

[1-3] A receiver appointed in a creditors' suit, who finds himself in possession of a leasehold estate, does not by possession become assignee of the term; he may become an assignee voluntarily, or he may so manage or mismanage the business committed to his charge as to be held in invitum to have "adopted the lease." But he always has a time, "reasonable" under the circumstances, wherein to decide whether the interests of his trust will be better served by adopting the lease or by rejecting it, which last act implies a prompt return of the leasehold estate to the lessor. But reasonable time for decision and promptitude in return are both relative terms, relative to existing and always varying circumstances, and in respect of leased transportation systems operating under franchises conferred by the public and serving public necessities, the overwhelmingly important circumstance is that the obligations of the carrier to the public must be fulfilled by the receiver, and the lessor's franchises must be preserved.

[4] During this period of provisional operation, the lease in no way governs the legal relations between receiver and lessor; such relations are ruled by the equities of the situation, and ordinarily these equities will be satisfied by the receiver turning over to the lessor, should the lease be rejected, the net earnings by him acquired during the period of provisional operation. These principles have been elaborated in Penna., etc., Co. v. New York City Ry. Co., 198 F. 725, 117 C. C. A. 503. And see, also (D. C.) 208 F. 182, and 216 F. 471, 132 C. C. A. 518. In the present instance it is not and cannot be asserted that Mr. Garrison's period of investigation and provisional operation (from July 15 to September 30) was unduly prolonged, or that actual surrender on October 18 was not prompt.

[5, 6] Further, it has been pointed out that, if the lease be rejected at the end of the provisional period of operation and assumed reflection, such rejection dates back to the beginning of the receivership. 198 F. 744, 117 C. C. A. 503. This ruling is now called a dictum, and it may be admitted as unnecessary for decision of the matter then in hand; yet it is right, and only states a part of the principles hereinabove outlined. If the receiver is not virtute officii the assignee of the term, if he remains a stranger to the lease until he adopts it, he must, upon definitive action of adoption or rejection, be held to have occupied from the beginning the same position that he ultimately assumes. If he rejects, he must account from the beginning as one who rejects, and if he assumes, he must from the beginning conform to the terms of the contract he has assumed. No receiver can finally say: I will account for net earnings only while I was thinking the matter over, but now that I assume the lease I will hereafter pay rent as agreed. Such a rule of law would be unthinkable, and equity follows the law in such a matter.

It is now argued that the principle just stated has been either overruled or modified by the decision in the same case over the "Second Avenue Lease" (225 F. 734, 141 C. C. A. 6), but for that suggestion we can see no justification. Ward, J., there pointed out that a receiver, "who has not adopted the lease, but wishes to remain in possession, may prefer to pay * * * a sum equal to the stipulated rent, though under no greater duty than to pay the net earnings of operation. The general rule is subject to such and other exceptions." Thus this court recognized the obvious truth that a receiver, who is considering whether to assume or reject a

lease, would find it difficult to persuade his own court that mere reflection on his part would long justify retention of the leasehold estate. He secures time for reflection, and ties the lessor's hands by paying accruing rental; i. e., living up to the lease, so that he can keep on thinking and experimenting. But (and this is crucial) he does not pay rental as one bound by the lease contract; he pays only to keep the lessor quiet, because the lessor is bound by his own contract.

In the Second Avenue Case the receiver had pursued this process, and found after some time that his rent payments exceeded net earnings for the period covered, whereupon he "asked to have such [rent] payments treated only as on account" (page 736 [141 C. C. A. 8]), and this in effect the court refused, holding him to rent payments while he had elected to pay rent and net earnings thereafter. See memo. on petition for rehearing 227 F. 1021, 141 C. C. A. 671, for the plainest statement on this point. Thus the case of the Second Avenue lease is not one changing or retracting any of the principles regulating the relation of receivers of leased transportation systems with the lessor owner, but one recognizing fully the general principle of prima facie liability by a receiver for net earnings only, but equitably regulating an accounting held on that principle.

Theoretically there is no difference in the accounting result, whether rent be paid or not, if net earnings equal or exceed rent for the provisional period. If the earnings over expenses other than rent be X, and the rent be Y, then if the receiver has paid rent he accounts for X–Y, and if he has not paid rent he accounts for X. In the instance of the Second Avenue lease Y was greater than X for the period covered by rent payments, the whole period of receiver's occupation was abnormally long, and the leased road was not surrendered voluntarily because assumption of lease was not desirable, but it was taken by the better title of a receiver in foreclosure of a mortgage on the leasehold property superior to that of the lessee. Under such circumstances, when it came to adjusting rights between the two receivers, this court treated the period during and for which rent was paid as one to be considered separately, on the ground that "it was impossible to restore the status quo of the date" of appointment of receivers in the creditors' suit (more than a year before), and to give to the lessor company or its receiver in foreclosure the "option of asking for the return of its property from the receivers (in the

creditors' suit) in case they operated for net earnings only" (page 737 [141 C. C. A. 9]).

To put the matter concisely, the creditors' suit receivers in the Second Avenue Lease Case wanted to state an account covering the whole period of their possession, debiting themselves with earnings which, during the period for which they had paid the rent, were less than the rent paid, credit themselves with the rent, and thus for that period bring the foreclosure receiver in debt to them—an inequitable method of escape from a business situation of their own making, and obviously calling for a special application of the general rule stated in 198 F. 725, 117 C. C. A. 503, that "in the absence of special equities" a receiver like Mr. Garrison does his "full duty when he turns over to the lessor the net earnings of the road"; for if the Second Avenue receivers (in the creditors' suit) had not paid rent for a period of unprofitable operation the lessor company could and would (as the court thought) have taken back their property and at worst managed their own losses. This was the "special equity" in the case relied upon by the receiver here—a decision fully recognizing the general rule as to accounting for net earnings, and applying the special equity to prevent inequity. The rule of net earnings was recognized and lately applied at this bar in American, etc., Co. v. New York Rys. (C. C. A.) 282 F. 524.

[7] To meet the exigencies of the present cause, we are practically asked by appellee to hold that, so long as a receiver of a lessee pays rent installments to the lessor, he may take and keep what he can make over the rent, because he is operating for the lessee. There is no such hard and fast rule, and the reason assigned for it is merely formal; a receiver is always operating, not for some party, but for the court that appoints him, to which he is accountable, and which is itself trying through that receiver to do equity to and for every one interested, from the largest shareholder to the humblest member of the general public. The court in the Second Avenue Case was doing equity under the special circumstances presented, and not laying down a stiff legal rule applicable to all cases, like (e. g.) the rule of consideration for a contract.

[8] Thus we reach the facts or special equities of this case. The City Co. owned and owns a valuable and busy transportation system, upon the maintenance whereof the possibility of maintaining the Brooklyn Rapid Transit system very largely rested. It was, though leased, by no means torpid, and was

quite ready to assert its rights to its own as soon as opportunity offered. There was no acquiescence on its part in any partial or slack performance by any one of the obligations created by the lease of 1893. We are convinced by the evidence, and confirmed by comments of counsel intimately connected with this receivership, that what was done between July and September, 1919, was to pay as little for and get as much out of the City Co.'s system as was possible. There was nothing wrong in this, but it shows the actualities of the situation.

The rent payable under the lease of 1893 consisted largely in paying to national, state, and municipal taxing authorities imposts measured by the property, activities, or profits of the City Co., and the covenant was to pay the same within a reasonable time. The sole considerable payment to the City Co. itself was the sum necessary to pay quarterly dividends on that company's share capital. From appointment until September 15 there was, as found by the master, a technical compliance with the obligation to pay taxes, etc., within a "reasonable time." On August 1, there fell due part of a state tax amounting to some $87,000, and for this payment an extension was obtained until October 1. On September 15, a quarter of the United States income tax became "payable," although it had in a strict sense become "due" on March 15, and was therefore a pre-receivership indebtedness; but this fact made no difference at all in the necessity of paying it, if reliance was to be placed on keeping the City Co. in a position where it could not reclaim its own, because it had nothing to complain of. As soon as payment of this income tax was refused, City Co. demanded its property, thereby showing its lack of acquiescence in any abrogation of its full rights under the lease. Such demand was promptly followed by disaffirmance of the lease and surrender of property to owners.

This statement seems to us conclusively to show what an idle pother may be made by attempting to inject rigid rules into what is essentially an endeavor to be equitable—i. e., fair—in a receivership accounting. If there were a rigid rule deducible from the Second Avenue Lease Case, then Mr. Garrison, when he was provisionally operating City Co.'s road, failed to pay two items of rent, viz. the state tax and the United States income tax above described; therefore under the Second Avenue Case, 227 F. 1021, 141 C. C. A. 671, as sought to be construed, he "must be charged with" them, and, if he were charged with them, the process would wipe out the net profits with which this appeal is concerned.

But there is no such rigid rule, and the real inquiry is whether any special equities exist to take this case out of the general rule that the receiver must account for net earnings during the provisional period of consideration as to whether to reject or assume a lease. We perceive no reasons at all, and so the result is as broad as it is long, and the receiver must pay the City Co. what he actually made out of the property over and above his expenses, including the rental charges he did pay, which we are informed is somewhat less than the aggregate of the rental items he did not pay.

Let the decree below be amended to state the account in accordance with this opinion. Otherwise, it is affirmed; cost of this appeal to appellant.