129 F.2d 1 (1942)
In re CHICAGO RAPID TRANSIT CO.
CHICAGO JUNCTION R. CO.
v.
SPRAGUE et al.
No. 7858.
Circuit Court of Appeals, Seventh Circuit.
June 30, 1942.
Rehearing Denied July 22, 1942.
*2 *3 John D. Black, Ralph M. Shaw, and Robert McDougal, all of Chicago, Ill. (Silas H. Strawn and George W. Ott, both of Chicago, Ill., on the brief), for appellant.
Thomas L. Marshall, David A. Watts, Joseph E. Nolan and Daniel C. Smith, all of Chicago, Ill., for appellees.
Before EVANS, KERNER, Circuit Judges, and LINDLEY, District Judge.
LINDLEY, District Judge.
In the course of reorganization proceedings of the debtor, a public transportation utility operating in Chicago, the District Court ordered the trustees to reject a lease of respondent lessor's branch line and directed that operation of the leased property by the trustees subsequent to the filing of the debtor's petition for reorganization be for the account of the lessor. From this order respondent appeals.
In 1903 respondent, the Chicago Junction Railroad Company, lessee of a railroad right-of-way owned by the Union Stock Yards and Transit Company of Chicago, built an elevated railroad structure running east and west at right angles across one of the main lines of the debtor, terminating on the west at the stock yards, all in pursuance of an ordinance of the City of Chicago which provided that the line when built should be permanently operated by the predecessor of the debtor under a lease or "other arrangement." Accordingly respondent, after building the line, leased it to debtor's predecessor, who agreed to pay as annual rental interest upon the bonds sold, to produce the cost of construction, some $93,080 per year. The lease was for 50 years with certain provisions for renewal and gave to lessor the right to revoke for default. The debtor, succeeding to its predecessor's rights, continued to use the structure as a part of its unified elevated transportation system in the city, until, in 1932, the District Court appointed receivers in equity for the debtor. At that time there was due respondent $30,509.55 delinquent rental. The receivers continued operation of the line in connection with the unified system, paying rental between June 28, 1932 and August 31, 1934, of $202,190.60. Since the latter date no rent has been paid.
On May 26, 1936 the lessor petitioned the court in the equity cause to direct the receivers to pay the rental then due. The petition, having been answered, was referred to a special master who, on December 31, 1936, reported recommending that respondent be allowed $30,509.55 for prereceivership rentals as a general claim and that the demand for rental between August 31, 1934 and March, 1936 be allowed as an expense of receivership in the amount of $139,620. The receivers took no steps to affirm or to reject the lease.
On January 22, 1937 the debtor filed and the court approved its petition under Section 77B of the Bankruptcy Act, 11 U. S.C.A. § 207, for reorganization, in which it stated that its good-will could be preserved and the interests of its creditors and of the public protected only by maintenance and operation of the property as a single transportation system. The court found the debtor to be a railroad corporation engaged in transportation of passengers for hire in intrastate commerce as a public utility under the laws of Illinois, subject to the regulatory jurisdiction of the Illinois Commerce Commission. It directed the trustees to continue to operate all property, assets and business taken over from the receivers.
Some four months later, the trustees filed a petition for an order requiring respondent to modify and revise the terms of the lease by reducing the rental to a reasonable amount to be determined by the court. Respondent answered, praying that the court deny the petition and order the trustees to pay the amount found due by the master in the receivership and all rentals accruing thereafter. On September 29, 1938 the trustees amended their petition praying, in the alternative, that they be authorized to abandon operation of the leased branch line, subject to approval by the Illinois Commission, and thereupon to disaffirm and abandon the lease. The petition was referred to a master and, while it was still pending, on the 12th day of July, 1940, the trustees filed a second amendment wherein they prayed in the alternative that they be authorized not to adopt but to reject the lease and that the court authorize them, if necessary to prevent discontinuance of public service until approved by the Illinois *4 authorities, to continue the operation solely for the benefit and account of lessor.
The court approved the findings of the master and ordered that the trustees not adopt but reject the lease, holding that the lessor was not entitled, after the date of institution of reorganization proceedings, to recover from the debtor or the trustees any contractual rent but only such amount, if any, as might be found due on an accounting by the trustees on the basis of having operated the property for the account of respondent after January 22, 1937, and finding that an accounting to that date showed a deficit for each of the years, 1937 and 1938, in excess of $116,000. The court directed the trustees to continue service over the leased property, not for the account of the estate but only for the benefit and account of respondent, and only until the trustees should be duly authorized to cease operation by reason either of the lessor taking over operation or physical abandonment of such operation, duly authorized. It ordered that, upon cessation of operation, the trustee surrender possession to respondent, and gave the lessor leave to file with the court its claim for any damages it might deem it had suffered because of rejection of the lease. The court found that it had jurisdiction, without permission of the Illinois Commission, to determine whether the lease was burdensome and should be abandoned; that it was in fact burdensome and should be rejected, and that there had occurred no such undue delay as would estop the trustees from electing not to adopt. This appeal followed.
Respondent contends that the court was in error in approving disaffirmance, in disallowing rental as an administrative expense of the estate and in directing that operation from and after the date of filing the petition for reorganization should be deemed for the account of the lessor. These questions are presented: May the trustees of an insolvent utility company, in reorganization under Section 77B of the Bankruptcy Act, reject a burdensome previously existing lease of a branch line? Does the fact that the leased line has been operated in conjunction with other property as part of a unified metropolitan transportation system have any relevance? Does the fact that the debtor is a public utility operating an intrastate system, subject to regulation by the Illinois Commission, limit or modify the bankruptcy court's power to reject? Did the order effectuate abandonment of a public service? Will it result in unauthorized confiscation of the lessor's property? Was the court justified in concluding that the trustees' operation should at all times be for the account of the lessor?
Sole jurisdiction in bankruptcy is by the Constitution lodged in the National Government. That power, when given expression in legislation by Congress, is paramount and transcends and supersedes all inconsistent state laws. State of Colorado v. United States, 271 U.S. 153, 162-166, 46 S.Ct. 452, 70 L.Ed. 878; Transit Commission v. United States, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342; New York v. United States, 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385; American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., D.C., 10 F.Supp. 512; affirmed, 2 Cir., 76 F.2d 1002, certiorari denied New York City v. Murray, 295 U.S. 760, 55 S.Ct. 923, 79 L.Ed. 1702.
Congress has not thus far attempted to reach the utmost horizon of the power. Under existing bankruptcy legislation, contractual relationships and obligations may be discharged; under certain circumstances, judgments valid under the state law set aside; preferences otherwise valid abrogated, and debts composed and settled for less than their face value. Even before the more recent extensions of bankruptcy jurisdiction by Sections 75, 77 and 77B, 11 U.S. C.A. §§ 203, 205, 207, a trustee was allowed to abandon assets deemed valueless and, in operation and maintenance of the assets, in liquidation and in equitable division of proceeds, to reject burdensome leases. All these are forceful illustrations of the far-reaching extent of this paramount federal power. The power to rid the trust estate of exorbitant unjustified expenditures and thereby to protect its beneficiaries, the creditors, is incidental to the power to fix the rights of creditors as of the date of attachment of jurisdiction in bankruptcy and to liquidate the assets and divide them ratably among beneficiaries. The Supreme Court has expressly held such authority lodged in the bankruptcy court by Section 77B. Philadelphia Co. v. Dipple, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651.
It is not for us to decide whether Congress may, in providing for bankruptcy administration of intrastate utility corporations, suspend all state legislation. Our essential question in this respect is narrowed *5 to this: whether, under the particular circumstances here, the order rejecting the lease infringed upon power still lodged in the state to regulate its own utilities.
In determining the extent of bankruptcy power, it matters little whether we consider the precedents under the original act or under Sections 75, 77 or 77B, for the intent and purport of all bankruptcy legislation, so far as the power to protect the estate is concerned, is largely declaratory of certain recognized equitable principles, namely: the power of a court of equity to protect property in its custody. United States Trust Co. v. Wabash W. Ry. Co., 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085; Ex parte Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689; Wabash Railroad v. Adelbert College, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; St. Joseph & St. L. R. R. v. Humphreys, 145 U.S. 105, 12 S.Ct. 795, 36 L.Ed. 690. This was recognized long prior to enactment of Sections 77 and 77B. Murphy v. John Hofman Co., 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327; Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645. Cf. Ex parte Baldwin, 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020; Continental Bank v. Rock Island Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Board of Directors St. Francis Levee Dist. v. Kurn, 8 Cir., 91 F.2d 118; Id., 8 Cir., 98 F.2d 394; Crawford v. Duluth Street Ry. Co., 7 Cir., 60 F.2d 212; State of Iowa v. Old Colony Trust Co., 8 Cir., 215 F. 307, L.R.A.1915A, 549.
Whatever the differences in phraseology of the various sections, the reasoning of the Supreme Court in its decisions under the various sections leads to the same end. Thus in Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 36, 84 L.Ed. 93, Mr. Justice Frankfurter, discussing whether the court has power to direct suspension of public utility service, commenting that, at best "this is subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself," added "in construing legislation this court has disfavored in-roads by implication on state authority and resolutely confined restrictions upon the traditional power of states to regulate their local transportation to the plain mandate of Congress. Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; cf. Kelly v. Washington ex rel. Foss Co., 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3." Having observed that for a long time, control of curtailment of local utility service has been deemed to lie within the regulatory authority of the state and that earlier federal legislation has not been deemed sufficient to confer jurisdiction over curtailment and partial discontinuances of utility service upon the federal courts, State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878, he said that if this familiar power of the state were to be deemed withdrawn by Congress in bankruptcy legislation, evidence of that withdrawal in fit language should be found within the act and that in the absence of such fit expressions disclosing such an intent upon the part of Congress to give the District Court the drastic power of determining whether an intrastate utility operation should cease, the Supreme Court was powerless to declare it in the District Court.
This is clear pronouncement that thus far Congress has not seen fit to empower bankruptcy courts with jurisdiction to determine the questions which confront state utility commissions in regulation of intrastate utilities, such as whether a service should be abandoned or whether public convenience and necessity require continuation. Thus far, then, these powers are still lodged in the state authorities and with them the bankruptcy court may not interfere.
But this is quite apart from the rule that in any bankrupt estate, the bankruptcy court has power to discard disastrous financial entanglements out of which grow only personal contractual relationships. It may cancel a burdensome lease; it may not order the utility to abandon a public service, without consent of the state. It may not itself regulate an intrastate public service, or interfere with regulation by the state. Its trustees, in operating a bankrupt utility, must comply with valid statutory regulation by the state.
It is said by respondent that the order of the District Court effected more than cancellation of a burdensome lease; that it also inevitably worked abandonment of an existing utility operation in violation of the right of Illinois to control the same. The order directed the trustees to reject the lease. Its plain purport was that thereafter the trustees should continue operation of the leased premises, not as lessees but wholly free from the obligations *6 of the lease, temporarily, until either respondent should take back its property, as it had a right to do, or the state should grant leave to abandon the operation. To our mind this reflected a nice distinction upon the part of the court between what it might properly do and what it might not. It could reject the lease and free the estate of the burden thereof. It could not order abandonment of service. It could not make a new contract between the parties. The court rightfully protected the estate by cancellation and equally properly protected the rights of lessor by providing that until and unless it should take over its property, the same should be operated for its account, a practice approved by the court in Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642. And it equally adequately protected continued operation as required by the utility laws of Illinois until the proper authorities should see fit to relieve both lessor and lessee of necessity of further operation. This was not creation of a new contract or modification of an old one. It was cancellation of contractual liability with preservation of the public operation as required by the laws of Illinois until the lessor could take over, or until relief of both parties from such obligation by the Illinois Commission.
This we think, under Palmer v. Webster & Atlas Nat. Bank, supra, was a correct solution, rendering due recognition to the principle there announced that it was not the purpose of the Bankruptcy Act to appropriate the money of a lessee's estate, which is ordered to reject a lease, to pay unsecured rental accruing to a lessor. "In a receivership of public utility property, where the lease is rejected, the receiver is not liable for rent as such but only for net earnings of the property under his administration. United States Trust Co. v. Wabash, W. R. Co., 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085; Pennsylvania Steel Co. v. New York City Ry. Co., 2 Cir., 198 F. 721, 727, 729, 730; Id., 2 Cir., 216 F. 458, 463; American Brake Shoe & F. Co. v. New York Rys. Co., 2 Cir., 282 F. 523, 528; Westinghouse Elec. & Mfg. Co. v. Brooklyn R. T. Co., 2 Cir., 6 F.2d 547, 549. * * * A receiver and, as here, the debtor, is required to operate the property until the lessor is in a position to take it over, and consequently he is accountable to the latter only for the net earnings if there are any and is entitled to recover for net losses." In re Connecticut Co., 2 Cir., 95 F.2d 311, 316, certiorari denied Connecticut Ry. & L. Co. v. Connecticut Co., 304 U.S. 571, 58 S.Ct. 1041, 82 L.Ed. 1535.
The trustees have no obligation to pay the rentals due under the leases, as such, unless and until they affirm the leases. They have a reasonable time within which to affirm or disaffirm. During the interim their sole obligation is to pay the lessors a reasonable amount for the use and occupation of the properties actually in use. This rule, which was originally laid down in railroad receiverships in equity, applies to the reorganization of a street railway under Section 77B of the Bankruptcy Act, 11 U.S. C.A. § 207. If an interim payment is made it is ordinarily held that it should not be in an amount in excess of the net earnings derived from the operation of the lessor's properties. In re Connecticut Co., supra.
Nor, under Palmer v. Webster & Atlas Nat. Bank, supra, did the order violate Section 65 Judicial Code, 28 U.S.C.A. § 124, enacted in 1887, providing that federal receivers shall operate trust property in accord with the laws of the state as the owner would be bound to do if in possession. The lessor would have us read into this statute imposition upon the court to require preferment of the lessor, a simple contractor creditor of the debtor, and its creditors, as against other creditors of the debtor. In such a relationship of debtor and creditor "no principle of equity justifies ignoring that relation when, so to do, might adversely affect the claims of other creditors." Philadelphia Co. v. Dipple, 312 U.S. 168, 61 S.Ct. 538, 541, 85 L.Ed. 651. Section 65 requires merely that the trustees shall operate the property in accord with the laws of the state. This obligation the trial court attempted to discharge. It said in effect that the lessor may continue operation as provided by the laws of Illinois or the trustees will do so for its account until the state shall authorize abandonment of operation. Under this order, the option of acting in its own behalf or permitting the trustees to act lies wholly with the lessor. There can be no question of the propriety of the order that operation be for the account of the lessor after rejection.
The order makes cancellation of the lease effective as of the date of the petition for reorganization, early in 1937. The lessor denies justification of a charge against it for the losses from the operation between the date of the original petition and the date of the last amendment of the petition of the *7 trustees for authority to reject. Within five months after the filing of petition for reorganization the trustee petitioned for authority to modify the terms of the lease and this remained, in substance, their prayer for relief until in September, 1938, they included by amendment, the alternative prayer that they be authorized to abandon operation of the leased line, and, thereupon, cancellation of the lease. Still later, after hearings in court and before a master, in July 1940, they filed a further amendment which, in the alternative, sought outright rejection of the lease. This prayer the court finally granted. But it is to be observed that though for more than four years after the filing of the reorganization petition the trustee used the property of the lessor in their transportation business, they proposed cancellation as early as September 1938.
The earlier equity cases made the period within which election to reject might take place subject to the relative test of reasonableness, considering the facts and circumstances in the particular case. In bankruptcy reorganizations the initial orders generally expressly preserve the right of rejection and prescribe a period, usually six months, within which it may be exercised. Extensions are frequently granted for further periods. American Brake Shoe & F. Co. v. New York Rys., D.C.S.D.N.Y., 282 F. 293; North Kansas City Bridge & R. R. Co. v. Leness, 8 Cir., 82 F.2d 9; General Finance Corp. v. New York S. Rys., 2 Cir., 54 F.2d 1008; Westinghouse Elec. & Mfg. Co. v. Brooklyn Rapid Transit Co., 2 Cir., 6 F.2d 547. The right of receivers or trustees to such a reasonable time is paramount to the lessor's right to reenter after breach of the lease. Palmer v. Palmer, 2 Cir., 104 F.2d 161, certiorari denied 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494.
In equity reorganization frequently the lessor made no attempt to reenter and take back its leased line, even though the lessee's receivers had defaulted. When, under such facts, the lease was ultimately rejected, the rule of operation for the lessor's account was quite uniformly applied. Just as in the period after disaffirmance, the rationale was the "consent theory." Even prior to rejection, the argument ran, the receivers were not bound by the lease. Only actual adoption could bind them. Since the lessor's right of reentry matured upon default in payment of the rent, it was reasoned, its failure to assert that right implied its acquiescence to operation by the receivers for its benefit. As such operation benefited the lessor by preserving its property and by discharging its obligations as a common carrier, the proper basis for accounting for operation was said to be to hold the lessee's receivers only for net earnings and, if there were none, to charge the lessor for the deficit. Thus, if the receiver eventually rejected the lease, operation during the trial period was for the lessor, and the estate liable at the most for payment only of a reasonable sum for use and then only if the operation showed a net profit. The same rule applies even more forcibly in bankruptcy reorganization. Deficits incurred during the trial period before rejection are chargeable to the lessor. Palmer v. Palmer, 2 Cir., 104 F.2d 161, certiorari denied 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494. Giving due weight to these principles, and remembering that the trustees exhibited their dissatisfaction with the lease within five months and prayed for cancellation some fourteen months later we believe no estoppel arose. The lessor knew that the lease, if burdensome, could be rejected; it knew, presumably, that it was a burden upon the estate and could be discharged in bankruptcy. It knew it might have its property turned back to it. It may not, with knowledge of these facts, assert successfully estoppel against the trust estate and its beneficiaries,  its creditors.
Respondent insists that the ordinance of 1903, imposed, by the municipal law of Illinois, a mandatory duty on the debtor to operate the leased line for its own account. Under the ordinance certain rights were granted the Junction on condition that the line be permanently operated by the debtor, "under lease or other arrangement." The Junction insists that under this language, only the debtor can operate the leased road and that disaffirmance of the lease works a violation of the ordinance, something the Bankruptcy Court has no power to accomplish. Murray v. Roberts, 2 Cir., 103 F.2d 889. This language negatives any intention that the lease between the parties could be the only possible status; rather it expressly suggested possibility of other arrangement. Then, too, the parties to the lease did not so regard the city's act. Their lease provided that the lessor, on default, might terminate it and enter upon and possess the leased property. *8 Obviously, the lessor could not legally have done so if the ordinance restricted use solely to the debtor.
In Murray v. Roberts, 2 Cir., 103 F.2d 889, relied upon by the Junction in support of its premise that a mandatory ordinance by a city is of such character that a proceeding in bankruptcy can not defeat it, there was a contract between the city and the transportation company leasing to the latter valuable city property. The city itself was protesting. Here we have only a private contract between the Junction and the debtor. There the complaint was by the city; here there is no objection by the city. We think the ordinance was no barrier to disaffirmation.
Respondent also insists that the order infringes upon certain statutory enumerated powers of the Illinois Commission. Illinois Rev.Stat., c. 111 2/3, secs. 49a and 27(b), Section 49a forbidding abandonment or discontinuance of an existing service without consent of the Commission applies only to physical abandonment by the utility. It does not refer to an involuntary change in legal obligations between the parties. City of Geneseo v. Illinois Northern Utilities Co., 378 Ill. 506, 39 N.E.2d 26. As pointed out the order to reject did not work abandonment of service. Rather it was court action working an involuntary legal change in obligations.
Section 27(b) of the Public Utilities Act prohibits one utility from acquiring control over another by a new contract without the Commission's consent. Here there was no acquisition of control of one utility by another but rather a temporary retention of possession in order to comply with state law. All benefit of the lease being rejected, the contractual relations are at an end. Green v. Finnigan Realty Co., 5 Cir., 70 F.2d 465; In re Connecticut Co., 2 Cir., 95 F.2d 311. The act of the court compelling operation to continue after the lease had been rejected brought about no new contract between the utilities.
Respondent also claims the judgment was not authorized since the lease was "in the public authority."
Since the Chandler Act had not been enacted when the original petition was filed, and petitioner sought relief under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, the District Court was proceeding under the latter rather than the former. The provisions of Section 77B therefore must control. They provide that upon approving the petition "* * * the judge * * * may direct the rejection of contracts of the debtor executory in whole or in part * * *." No exception is made of contracts "in the public authority." Clearly to give section 77B (c) (5) any meaning, the court should be permitted to disaffirm a lease in advance of a plan of reorganization, and the question whether it is "in the public authority" is of no pertinence.
Even adopting respondent's contention that the court may not upset contracts in the public authority, the situation here is not within the phrase. We are dealing with a lease between two utility corporations. To hold this contract "in the public authority" would effectuate inequitable preferences of an unsecured creditor,  the lessor in a burdensome lease. Were the City of Chicago protesting that the debtor is mandatorily bound to operate the Junction's property permanently by force of the ordinance of 1903, we would be confronted by a more difficult question. But the contrary is true. The city has adopted an ordinance which obviously releases any right upon its part to insist upon such construction of that of 1903. This new ordinance describes the rights and interests of the debtor under the Junction lease, recognizes that the latter is "subject to any orders which may be entered in" the debtor's reorganization proceeding or by the Illinois Commission and provides that any obligation upon the debtor in reorganizing to assume the lease exists "only to the extent and in the manner provided by order" of the Bankruptcy Court. Thus the city expressly admits the court's jurisdiction to act and joins it in its attempt to iron out the badly ruffled situation.
Respondent insists that to approve the order is to reorganize piecemeal, a practice condemned in Public Service Commission v. Philadelphia Rapid Transit Co., 3 Cir., 82 F.2d 481, 486. However, in that case a reorganization plan had been filed, and the court was confronted by no question of disaffirmance of a lease. The cancellation here is no part of a pending reorganization plan.
Respondent contends that the evidence was not sufficient to sustain the finding that the lease was burdensome. The *9 master described the method by which calculations were made and the basis for allocation of expenses and income between the system as a whole and the leased line. The evidence is of great length and involved character and reflects conflicting theories of the parties. Inasmuch as it is all in the record, and in view of our conclusion as to its substance, it would serve no good purpose to discuss it at any great length. Suffice it is to say that we have examined and carefully considered it and find ourselves unable to say as a matter of law that substantial evidence does not exist to support the finding.
Obviously mathematical certainty of the exact amount of deficit chargeable to the leased line is both impossible and unnecessary. The pertinent question is whether there is substantial evidence of a substantial deficit. The calculations made were based upon a consideration of all relevant elements: the comparative mileage of the leased line and that of the system, the average traffic on both on the average day, the revenue collected at the leased line stations from all passengers using that line, the round-trip tickets, the one-way tickets, an exact count of the origin and distance of traffic upon a day which, if not typical, was above the average, the comparative through and local traffic, the average distance of travel, revenue from station and car privileges, equipment and power, and various other items, most of which were apportioned on the basis of car mileage. Rentals from subleases of the leased property were credited to respondent. The expenses of operation were divided upon a car mileage basis. A careful consideration of all the evidence leaves no doubt in our minds but that there was in fact a substantial deficit resulting from the operation of the leased line and that the lease was, therefore, burdensome.
The judgment is affirmed.
EVANS, Circuit Judge (dissenting).
Granting, for the moment, that under the bankruptcy laws, the trustee of the bankrupt debtor, like a receiver in a court of equity is not bound by the terms of a lease such as is described in the majority opinion, but may reject it and terminate liability thereunder, there is nevertheless, a limitation or condition to said right of rejection, namely, timely action by the lessee, or the trustee. Clark on Receivers, Sec. 443.
The facts in this case fail to show either rejection or timely rejection of the lease by the trustees or their predecessors, the receivers. On the other hand, the action by them taken was, in legal effect, an affirmance of the lease.
The dates are important.
June 28, 1932, receivers were appointed for the lessee, the debtor herein.
June 28, 1932, to August 31, 1934, rent fixed in the lease was paid by the receivers.
May 26, 1936, lessor petitioned the court for an order directing the receivers to pay the rent then past due. An answer was filed; a reference to a special master had.
December 31, 1936, the master filed his report and recommended that lessor be allowed $30,509.55 for pre-receivership unpaid rentals, as a general claim; that the rental from August 31, 1934 to March 9, 1936 be allowed as an expense of the receivership in the sum of $139,620. The receivers took no action to affirm or reject the lease, or to except to master's report.
January 22, 1937, debtor filed, and the court approved, its petition for an adjudication under Section 77B of the Bankruptcy Act. Trustees were appointed and ordered to continue operation of the property, assets, and business taken over from the receivers. This included the leased property here involved.
Four months later, May 13, 1937, the trustees filed a petition for an order, requiring the respondent to modify the terms of the lease by reducing the rental to a reasonable amount, which was to be determined by the court. Respondent answered and asked that the petition for reduction of the rent be denied and that the trustees be required to pay the amount previously found due by the master, and also for rentals accruing thereafter, none of which had been paid.
A year later, September 29, 1938, the trustees amended their petition praying in the alternative that they be authorized to abandon operation of said leased line, subject to approval by the Illinois Commerce Commission. This was alternative relief, sought only in case the rent was not reduced. This petition was referred to a master, and, while still pending on July 12, 1940, the trustees filed a second amended petition wherein they prayed in the alternative, that they be authorized "not to adopt but to reject the lease" and the court *10 authorize them, if necessary, to continue operation, but solely for the benefit and account of the lessor.
The court approved the findings of the master and ordered that the trustees "not adopt, but reject the lease," and also held that the lessor was not entitled, after the date of institution of reorganization proceedings, to recover from the debtor or trustees any contractual rent, but only such amount, if any, as might be found due on an accounting, and that for the years 1937 and 1938 on such accounting there was a deficit in excess of $116,000 charged to the lessor.
The foregoing acts, far from showing a rejection of the lease during the first four years of operation of the receiver, clearly showed a ratification of it. If any significance may be drawn from the action of the court during the period from 1932 to 1940, it is affirmative in character. For two years the receivers paid their rent. Thereafter, upon application of the lessor, the court referred the matter to a master to ascertain how much was due. The master's report was filed, finding that lessee owed lessor under the lease, two years rent. No exception was taken to this report. This action was consistent only with an affirmation of the lease.
The same is true of the action of the court upon the appointment of trustees in bankruptcy. The court directed the trustees to continue to operate the property, assets and business taken over from the receivers. Among the assets and business operated by the receivers was the leased property in question.
More important and significant is the action of the trustees who, being fully informed, sought, not to cancel the lease, but to secure a modification and revision of the rental. This action was inconsistent with cancellation or termination, but consistent with the continuance of the lease.
Something over a year later it amended its petition and sought, as alternative relief, that if the rental was not reduced, that they be given the privilege of canceling the lease. The alternative was only in case the affirmative action modifying the lease was denied.
In the meantime, the trustees continued in possession of the property and used it, for two more years. Then, in July, 1940, the trustees filed a second amendment wherein they prayed in the alternative that they be authorized not to adopt, but to reject, the lease; however, also praying that they be authorized to continue in possession of the property and to operate it, but solely for the account of the lessor.
It is an incongruous inconsistency, a dissonance of irreconcilable repugnancy, to direct a lessee to remain in possession of the leased property and operate it and charge the deficit to the lessor and yet call such action a cancellation of the lease. It would better be described as a hybrid order wherein the terms of the lease are ratified but the obligation to pay rent is repudiated.
This was what was done. The master, on the last reference, found the lease should be terminated, but the lessee should remain in possession; the deficit from the operation, which was known to have occurred, and would occur, should be charged to the lessor.
These facts showed ratification by the receivers. Assuming the action of the receivers was not binding on the trustees of the bankruptcy estate, a somewhat violent assumption, we meet a closer question.
The trustees were directed to take over and operate this property. Never did they ask for an out and out rejection of the lease. First they asked for a reduction in the rent. This was an act of affirmation. Then, but only as an alternative, they asked for a rejection of the lease. Before this was acted on they amended their petition and prayed for an order to operate the property, but for the lessor's account. The meaning of "lessor's account" was, at this time, known to the parties. It meant the deficit from operation was to be charged to the lessor, but possession and operation were to be in the lessee as the lease provided.
There never was a disaffirmance of the lease. All acts of the lessee, as well as of the court, up to November, 1940, were acts of ratification. Likewise, the ultimate ruling of the court to the effect that the lease should be rejected, but the lessee remain in possession and operate the property, is consistent with affirmance not with rejection. It is quite inconceivable to think of a disaffirmance of a lease, yet leaving lessee in possession of the property and operating it.
I am unable, also, to agree with the majority opinion which affirms the action of the District Court on the accounting. The theory of the District Court seems to have been that the lease might be disaffirmed, yet the lessee retain possession of the property. In other words, the lessor, who ordinarily *11 possesses the property after a lease is cancelled, enjoyed but one right, namely, to pay the deficit which the operation by lessee was certain to entail.
Final disposition of the accounting must turn upon whether the lease was ever validly terminated. Believing that the right to cancel the lease was lost, and also being convinced that there never was a cancellation of this lease, but merely a repudiation of the rental obligation therein, I think it should be held that the lessee is indebted to the lessor for rent from 1932 to the present time.
If we assume the lease was validly terminated in 1940, upon the application of the trustees, then the rental should be limited to the date of such order. The rental is not necessarily the sum fixed in the lease. Nor is payment by lessor to the lessee while the latter is in possession rental.
Assuming that the leased property was of no value as a going concern, it seems unconscionable that the lessee should be permitted to continue to operate it, as a feeder, and charge the deficits from its operation to the lessor, to whom lessee has refused, and still refuses, to pay past rentals or to deliver possession.
It is hardly necessary to add that I think the decree of the District Court should be reversed.