PROVOSTY, J.
At the time of the failure of the defendant bank the plaintiff board was one of its depositors, and had a $10,000 bond for its security, upon which the American Surety Company, a codefendant herein, was surety. Its deposits amounted to $22,-211.91, plus a check for $14,000, which had been deposited, but not yet cashed. Payment of this check was stopped on news of the failure of the bank. The surety company offered to pay at once the $10,000, but on condition that the board should assign to it a like amount of its claim against the bank, and that any dividends that should be declared by the bank should be applied first to the reimbursement of the amount thus paid, and that the $14,000 check should be included in the assignment. The bond contained no condition of that kind, though it contained many not needing to be mentioned; and the board very naturally refused to make the assignment. After some delays and discussions an agreement was reached by which the demand that the $14,000 check be included in the assignment was waived, and the $10,000 of the board’s claim against the bank to which, on payment of the bond, the surety company became subrogated, was allowed to come pro rata with the $12,211.91 remaining to the board against any dividends that might accrue from the liquidation of the bank, and this agreement was reduced to writing. Pursuant to its terms the first dividend was paid pro rata to the parties; the pro rata share of the surety company being *425 $2,500. The $14,000 check, it may be' interesting to mention, was very soon collected in full by the board. When the law by which the Attorney General of the state is made the legal adviser of all public boards went into effect, that officer advised the plaintiff board that it had been without authority to make an assignment of any part of its rights to the surety company, and brought the present suit against the bank and the surety company to annul the said assignment and to recover back the dividend paid to the surety company. The date of the failure of the bank was April 15, 1912; that of the assignment was April 30, 1912; that of the payment of the dividend was July 29, 1912; and that of the filing of this suit was November 22, 1913. These dates are mentioned merely for greater fullness of statement; they are unimportant, as no prescription has intervened, and none is pleaded; the assignment continued to be null, if it was originally so.
The ground of nullity relied on is that the surety company was not entitled to the said assignment; and hence that the transfer of the board’s rights was a mere gift, and, as such, was null, as being in violation of a prohibitory law (articles 58 and 59 of the Constitution), which reads:
Article 58:
“The funds, credit, property or things of value of the state, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private.”
Article 59:
“The General Assembly shall have no power to release or extinguish, or to authorize the releasing or extinguishment, in whole or in part, of the indebtedness, liability or obligation of any corporation or individual to the state, or to any parish or municipal corporation thereof,” etc.
The defense of the surety company is that it was entitled to be subrogated to the rights of the board, as was done by the assignment, and that, therefore, the transfer was valid, but that, even if it was not, the board is es-topped from contesting its validity because it was made in pursuance of a compromise by which in consideration of it the surety company renounced in great part the rights it was asserting.
The liquidator of the bank adopts and makes his own this defense of the surety company, and, in addition, pleads that the payment of the dividend to the surety company was authorized by the plaintiff board, and was therefore valid as between said board and the bank, and he prays for judgment over against the surety company for any judgment that may be rendered against the bank,
[1] The demand against the bank may be disposed of in a few words, and it may as well be done here. The dividends were payable on the orders of the plaintiff board; and the said assignment, even though assumed to have been invalid as between the board and the surety company, Was an express order of the board to pay the money to the surety company, and, as such, was good authority for the payment.
[2] In support of the asserted right of the surety company to be subrogated to the rights of the board in the manner that was done, the learned counsel for the surety company argue that, the purpose for which the bond was given having been that it should serve as security for the deposits, its amount should have been made equal to that of the deposits; that the law so required; that, had this been done, the surety company, on payment of the bond, would have been entitled to full subrogation to the rights of the board; that therefore the surety company was entitled, on payment of the bond, to be subrogated to the rights .of the board in a proportionate amount; and that it could not be deprived of that right by the act of the board in either taking the bond in too small an amount in violation of law, or else in allowing the deposits to exceed the amount of the bond counter to the intendment of the *427 contract of the bond. And counsel cite in support of that argument a decision of the Lord Chancellor of England. Ex parte Rushforth, 10 Vesey, 410, 8 Rev. Rep. 10.
If it were true that by the requirement of the law under which'the bond was given, and by the intendment of the bond contract, the deposits were not to exceed the amount of the bond, that argument might have some force, and the decision cited might have application; but it is not true that the said law so required, nor that the contract so intended.
The law in question is Act No. 316 of 1910, p. 53S, § 4. It requires the bond to be renewed yearly, and the amount to be “equal to the estimated average daily balances of the year previous.”
Counsel state that the average daily balances of the year previous were in excess of $10,000; but there is not a word of evidence on that point in the record, and for making that statement counsel have to rely exclusively upon the naked fact that the balance was largely in excess of that amount when the bank failed. That single fact is a slender thread to hang by; since a depositor’s bank balance of to-day can hardly be said to be any indication of what the average daily balances of the year previous were. Doubtless, an inference does arise from the condition of a bank account at one time as to what it was at another time, but so very slight as to be easily overcome by the presumption of. regularity attaching to official acts; and, according to this presumption, the officers of the board must he assumed to have done their duty and fixed the bond in the right amount. We may add, however, that we do not see what influence the fact that the amount of the bond had been fixed either too high or too low could have upon the case; since no contention is made that the bond would on that account be any the less valid, or have any the less to stand good according to the condition expressed in it..
With regard to what was the intendment of the contract, the law under which the bond was given, and, indeed, the bond itself, speaks very plainly. The language of the statute is that the bond shall be taken “for the safe-keeping and return of the deposits.” The condition expressed in the bond itself reads as follows:
“Whereas, the said principal has entered into an agreement with said obligee to become the depositary of funds for and on account of the said obligee, and the principal has agreed and bound itself to pay out on demand, by check or otherwise, of the said obligee any and all sums deposited with it, as aforesaid, by the said obligee, at times and in amounts as may be shown by said demands of said obligee, by cheek or otherwise, the whole in accordance with the custom or usages of the banking business:
“Now, therefore, the condition of this obligation is such that, if the said principal shall well and faithfully perform the said contract on its part, according to its terms, covenants, and conditions, then this obligation shall be void; otherwise it shall remain in full force and effect.”
Thus it is seen that the condition of the bond was to secure the return of “any and all sums deposited” with the bank, and not, as counsel would have it, of a sum equal to the amount of the bond. The bond is not given for the highest amount the board may be expected to have at any one time, but for an amount supposed to be equal to what the average daily balance during the year will be, judging from what was the average during the past year. And, it being thus given for the average amount of the future deposits, and not for their highest amount, it shows on its face that the parties contemplated that its amount would at times be exceeded by that of the deposits, and that it was executed with that fact well in view and clearly understood, and also that there should be no, limit to the amount which the excess might reach.
And it is that fact which distinguishes this case from Ex parte Rushforth, supra. In that case the debt to be secured was not to exceed that of the bond. The Lord Chancellor so found from the facts, and what he *429 held- was that by that circumstance the case was taken out of “the rule that,.where a man engaged for the whole of a debt pays only a part, he has no equity to stand in the place of the person paid.” In the present case the debt to be secured was the total amount of the deposits, no matter what it might be.
By the said argument of counsel the object of giving the bond would be defeated. The situation was that the plaintiff board stood in no need of a bond for the return of whatever part of the deposits it was sure to. recover from the bank either as a going concern or as a concern in liquidation; it stood in need of a bond for that part which would be lost unless a bond was taken; that is to say, for that part not recoverable from the bank. The bond was given to supply that need. According to the argument of counsel, it is not the balance endangered by the possible failure of the bank that is to be secured by the bond, but some part not in danger of being lost, so that, after the surety company has paid this part not in danger of being lost, it is to be entitled to be reimbursed by the bank. The argument will not hold water; it but renews the question long ago settled in the civil law as to what is to be the effect or operation of a bond given to secure part of a debt either already created or to be created.
From Pandectes Francaises, Obligations, 3479:
“It is admitted in another opinion that the security which is given only for a part of the debt is extinguished only when the debt has been paid in full; the partial payments made by the principal debtor being imputed first to the portion of the debt not secured. This mode of imputation flows, it is said, from the nature and purpose of suretyship, for the partial surety guarantees precisely such part of the debt as may not be paid by the principal debtor.”
From Laurent, vol. 17, No. 619, p. 603:
“How must we decide if there is surety for a part of the debt only? A partial payment is made. Shall it he imputed to the part for which there is surety or to tile part for which there is no surety? It might be urged that it is doubtless very convenient for the surety to escape by an imputation from the obligations which he has contracted; but where would equity be? He was taken as surety precisely to the end that his partial suretyship might guarantee in the total debt that part which up to the amount of the surety would not be paid. This imputation would release the surety from his engagements to the prejudice of the creditor. This latter consideration, in our opinion, is decisive. Legal imputation ought never to prejudice the creditor ; it ought not to take away from him a guaranty upon which he relied. This would be to impair his rights, which is in opposition with the principle of legal imputation. And so the Court of Cassation has decided. It is of the nature of suretyship, says the court, that the surety be bound to satisfy the obligation to the creditor, if the debtor himself does not satisfy it; hence it follows that, if the suretyship bears .only upon a part of the debt, the payment made by the debtor ought to be imputed first- to that part of the debt not paid.”
From Troplóng, Du cautionnement, No. 247:
“Peter owes $10,000. James signs as surety for $5,000. The discussion of Peter’s property yields only $5,000. Has the creditor recourse against James for the $5,000 which remain? The affirmative is certain. It would he doubtless convenient for the surety to escape by an imputation from the obligations which he has accepted. But where would equity be? He was taken as surety precisely to the end that his partial suretyship might guarantee in the total debt that part which up to the amount of the surety would not be paid; and when he has referred the creditor to a preliminary discussion he is presumed to have contracted the obligation of paying ‘quanto minus servari potuerit.’ (Less by as much as may be saved — i. e., by the discussion.) Provided, then, that not more is demanded of him than he has promised, he ought to be ready to satisfy the creditor.”
To the same effect is the common law, as we gather from the following passage in 37 Cyc. 379, vo. Subrogation:
“Part Payment: There can be no subrogation to the right of another unless the claim of that other is 'fully satisfied ; and until the whole debt is paid there can be no interference with the creditor’s rights or securities which might, even by a bare possibility, prejudice him in the collection of the residue of his claim.”
A case exactly analogous with the present one is State ex rel. Moore v. Perkins, 114 La. 302, 38 South. 196, where bond was given by a sheriff conditioned that he should pay into the state treasury “all licenses and tax *431 es collected,” and the court held that the surety, though paying the entire amount óf the bond, was not entitled to subrogation so long as the debt of which the bond secured a part had not been paid in full. There the bond was, as in the instant case, for a part of a debt of uncertain amount which was to arise in the future.
It is very doubtful whether the assets of a defunct corporation held by a judicial liquidator for the benefit of creditors — held, in other words, in gremio legis — is not to be viewed in the light of a security, or sort of pledge, for the payment of the debts of the corporation, and whether, therefore, article 2162, O. O., would not be applicable to such a case. If applicable, it would certainly be conclusive against the rights asserted by the surety. It reads:
“Art. 21G2. The subrogation established by the preceding articles, takes place as well against -the sureties, as against the debtors. It cannot injure the creditor, since, if he has been p'aid but in part, he may exercise his right for what remains due, in preference to him from whom he has received only a partial payment.”
We conclude that the surety company was not entitled to come in competition with.the plaintiff board against the dividends to accrue from the liquidation of the bank for the reimbursement of the amount paid on the bond, and, as a corollary, that the board was under no obligation to assign to it the right to do so, and that the assignment was, in consequence, without consideration, or, in other words, a mere gift; and we pass to the' consideration of the alleged compromise.
[3,4] A compromise is a contract, and therefore the first requirement for its validity is that the parties to it have the capacity to contract relating to the matter which forms its object, or, as article 3072, C. C., expresses it, “have the capacity to dispose of the things included in the compromise.” The plaintiff board is a corporation, but of a peculiar kind known as quasi corporations; it is a mere agency or instrumentality of the state, admittedly possessed of only such powers as are either expressly conferred upon it by statute, or are necessary for the exercise of the functions with which it is charged. No contention is made that it is expressly given any power to compromise or, generally, to contract. But the argument is that the power to enter into such a compromise as the one in question is necessary to the proper conduct of its business. What business? We know of none for the transaction of which the said power to compromise could be necessary. xVpart from the powers with reference to quarantines, which are more extended, the powers to contract that are conferred upon said board, so far as we can see from a perusal of the several statutes under which it exists and operates, are strictly such as are directly and immediately connected with the functions of a board of health. They appear to be limited to the employment of inspectors and other officers and the fixing of their salaries, and the providing of “nurses, medicines, clothing, bedding, appliances, tents and other -necessary paraphernalia, so as to repair to any locality in the state that applies to for assistance upon the outbreak of an infection or contagious disease,” except that the board is also given the power to select a depositary, 'which, we assume, would 'include the power to agree with the depositary upon the rate of interest which the depositary would have to pay upon the deposits. Eor the proper discharge of these functions the power to enter into a compromise by which the board should lose a part of the deposits made by it in the bank does. not appear to us to be at all necessary.
It may be well to mention that the making of the bond by which the deposits are to be secured is not a matter of agreement between the board and the other parties to the bond, but that the execution of the bond is but a fulfillment of a condition imposed by law upon the depositary bank; the existence of *433 the bond is but a part of the qualification of the depositary for becoming such, in the same way that the fact of being a chartered bank is a part of its qualification. Doubtless, the ooard has to see to it that the surety is a proper one, and that the amount is proper; but this is not a taking part in the contract of the bond, but merely the discharge of' an official function.
In the case of Dugas v. Donaldsonville, 33 La.. Ann. 668, where the board of selectmen of the town had been given authority by the town charter “to issue bonds of said town, for such sums, not exceeding $25,000, as in their judgment may be required for the interest of said town,” and the' town, under this authority, had issued new bonds for taking up old ones that had matured, and upon which suit was threatened, and the new bonds were attacked as having issued without consideration because the old were invalid, and the agreement by which the new bonds were substituted to the old was pleaded'as a compromise, and the authority of the town to enter into the compromise was challenged, the court held that the power to issue bonds as, in the judgment of the selectmen, might appear to be for the interest of the town, carried with it the power to make the compromise in question. Counsel cite that case as authority for the proposition that state agencies like the plaintiff board have the power to compromise any matter in which a compromise would appear to be advisable. But, evidently, the said decision is founded, not upon any such general proposition as that state agencies have an inherent or necessary right to compromise, but upon the said special authority to issue bonds in an honest exercise of discretion.
Some importance is sought to be attached •to the fact that, as a result of the failure of the bank, the board was in dire need of money, and that, in view of that fact, the obtaining of the $10,000 payable under the bond at once, instead of at the end of a lawsuit, was of material consideration to the board; in fact, was necessary to enable it to discharge its functions. But this argument is-merely specious; it has the fatal defect of proving too much; for if, because necessary to enable the board to discharge its functions,, the procuring of money justified the compro - mise, in like manner, and by the same token, it would justify the borrowing of money, and the issuance of notes or bonds, if the money was not obtainable otherwise. The argument is but the plea of necessity which, if carried to its logical conclusion, would justify crime.
The judgment appealed from is therefore-affirmed in so far as it dismisses the plaintiff’s suit against the Teutonia Bank & Trust Company, and is otherwise set aside; and it is now ordered, adjudged, and decreed that the assignment made by the plaintiff board to-the defendant surety company of date April 30, 1912, be and is hereby annulled and set aside in so far as it purports to transfer to-the said surety company the right to collect dividends from the defendant bank prorata with the plaintiff board; and it is further ordered, adjudged, and decreed that the plaintiff board have judgment against the-defendant surety company in the sum of $2,500, with legal interest thereon from the 29th day of July, 1912, until paid, and that the defendant surety company pay the costs-of this suit.