NORTH KANSAS CITY BRIDGE & R. CO.
v. LENESS et al.

CHASE NAT. BANK OF CITY OF NEW YORK et al. v. NORTH KANSAS CITY BRIDGE & R. CO. et al.

Nos. 10310, 10311.

Circuit Court of Appeals, Eighth Circuit.

Feb. 27, 1936.

Henry L. Jost, of Kansas City, Mo. (James S. Simrall, of Kansas City, Mo., on the brief), for North Kansas City Bridge & R. Co.

C. E. Lombardi, of Kansas City, Mo., for Chase Nat. Bank of City of New York and others.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

These appeals are from a decree fixing the amount of the rentals due from the receiver of the Kansas City, Clay County & St. Joseph Railway Company (hereinafter referred to as the Interurban Company) to the North Kansas City Bridge & Railroad Company (hereinafter called the Bridge Company) for the use by the receiver of its bridge over the Missouri river.

The Interurban Company was organized under the laws of Missouri for the purpose of operating a line of electric railway from Kansas City, Mo., to St. Joseph, Mo., and from Kansas City to Excelsior Springs, Mo. For the purpose of extending its line across the Missouri river and entering Kansas City, it made a contract with the Bridge Company on May 1, 1911, for the use of its bridge, then under construction. By the terms of this contract, the Interurban Company was to pay the Bridge Company $1 for each revenue car which passed over the bridge and a lesser amount for nonrevenue cars. The minimum rental for the first year of operation was to be $25,000, and each year thereafter this minimum was to be increased by $1,000 until it reached $35,000, which was thereafter to be the minimum rental to be paid by the Interurban Company. The contract was for fifty years. It contained no provision expressly giving the Bridge Company any lien upon the property of the Interurban Company as security for rentals, but provided that the rental charge should be an "operating expense" of the Interurban Company.

After the contract was executed, the Bridge Company, in order to provide for the additional burden on the bridge resulting from the heavier cars of the Interurban Company, had the bridge plans redrafted, and at considerable expense to itself increased the strength of the bridge.

Shortly after it had made the rental contract with the Bridge Company, the Interurban Company issued its bonds secured by a first mortgage upon all its assets, including its rights under the contract for the use of the bridge.

For some years thereafter, the Interurban Company prospered, but, like so many similar companies, due to changing methods of transportation attributable to good roads and motor vehicles, it later fell upon evil days. A creditor's bill praying for the appointment of a receiver was filed November 10, 1930, by George J. Leness on behalf of himself and all other creditors, and on November 12, 1930, the allegations of the bill having been admitted, Robert P. Woods was appointed receiver. From the time of his appointment until March 10, 1933, when the court ordered operations discontinued, Mr. Woods was in charge of and managed the property of the Interurban Company as an officer of the court.

Shortly after his appointment, the receiver wrote the Bridge Company, proposing that he continue operations under the terms of the rental contract, without either affirming or disaffirming it, and that the reasonable time within which he should be required to elect whether to affirm or disaffirm the contract should not begin to run until he had notified the Bridge Company or it had notified him to that effect. The Bridge Company, in writing, agreed to this proposal.

Under orders of the court, the receiver paid the contract rentals to the Bridge Company from the time he took over the Interurban Company until December 31, 1930, and from that date to December 31, 1931. These orders expressly provided that they should not be regarded as an affirmation of the contract. From January 1, 1932, to April 1, 1932, the receiver paid to the Bridge Company only $4,371.79, which was the per car passage charge for that period. The pro rata minimum rental for that time was $8,750.

On April 1, 1932, the receiver, under his arrangement with the Bridge Company, gave notice to it that the contract for the use of the bridge would be either affirmed or disaffirmed within a reasonable time thereafter. He then filed a petition with the court for instructions as to whether to affirm or disaffirm the contract. The record does not show whether any instructions were given, but from April 1, 1932, to March 10, 1933, he paid only the per car passage charge. The Bridge Company thus received for the year 1932, $15,529.47, and for the period from January 1, 1933, to March 10, 1933, $2,359.80.

The receiver's operation of the property of the Interurban Company resulted in such a large deficit that a loss would have been sustained had no rentals whatever been paid for the bridge during the receivership.

The Bridge Company filed three intervening petitions in the creditors' suit. The first, filed January 28, 1933, requested the court to direct the receiver to pay as rental for the year 1932 the difference between what he had paid and the $35,000 minimum yearly rental, or $19,470.53. The second, filed March 31, 1933, asked the court to direct the payment of $4,414.38 as the balance of rental due from the receiver for the period January 1, 1933, to March 10, 1933, being the difference between what the receiver had paid for that period and $6,774.18, the portion of the $35,000 yearly minimum rental allocable to that period. A third petition was filed claiming $424,644.32 as the present worth of future profits under the contract, but this petition was dismissed, and its dismissal is not assigned as error.

The answer of the receiver to the petitions was that the contract for the use of the bridge had not been affirmed by him, and that the payments which had been made were reasonable and adequate compensation for the use of the bridge.

A committee of the first mortgage bondholders of the Interurban Company then intervened and asked that the petitions of the Bridge Company be denied, and that it be required to restore to the receiver $9,139.27, the difference between the $17,889.27 paid as rentals for the period January 1, 1932, to March 10, 1933, and $8,750 which the committee conceded to be the correct rental for the period January 1, 1932, to April 1, 1932, during which the preliminary arrangement between the receiver and the Bridge Company was in force.

On June 25, 1933, the Chase National Bank of the City of New York and John F. Downing, as trustees, brought suit to

foreclose the first mortgage of the Interurban Company, joining the Bridge Company as a defendant, and asserting that any interest of the Bridge Company in the mortgaged property was inferior to the lien of the mortgage. The Bridge Company set up in its answer in the foreclosure proceedings the same claims for rentals which it asserted in the creditors' suit. It also asserted a lien for these rentals superior to the lien of the mortgage.

The issues raised by the petitions of the Bridge Company and the answer of the receiver in the creditors' suit, and those raised by the complaint and the answer of the Bridge Company in the foreclosure suit, were tried together. The court below decided that the Bridge Company was entitled to the minimum rentals provided for in the contract from November 12, 1930, the time of the appointment of the receiver, to April 1, 1932, when the Bridge Company was notified by the receiver that he would affirm or disaffirm the contract within a reasonable time, that being in accordance with the agreement entered into by the Bridge Company and the receiver with the approval of the court. The court also decided that, after April 1, 1932, and until March 10, 1933, when the receiver, by order of court, abandoned operations, the Bridge Company was entitled to receive the fair rental value of its property used by the receiver, and that the per car passage charge already paid was the fair rental value; that the Bridge Company had no equitable mortgage or other lien upon the assets in the hands of the receiver; and that the bondholders' committee was not entitled to have the Bridge Company restore anything to the receiver. The court held that the receiver had not affirmed the contract. Under the decree entered in accordance with the court's decision, the Bridge Company was allowed $4,378.21 as the amount still due for the period from January 1, 1932, to April 1, 1932. The Bridge Company appealed, and the trustees under the mortgage and the bondholders' committee filed a cross-appeal.

The questions which we are to determine are:

1. Was the receiver at any time bound by the contract between the Bridge Company and the Interurban Company?

2. Has the Bridge Company an equitable lien upon or a right to preferential payment of contract rentals out of the property of the Interurban Company superior to the lien of the mortgage?

3. What amount is the receiver obligated to pay the Bridge Company for the use of the bridge from April 1, 1932, to March 10, 1933?

1. The Bridge Company contends that the receiver was bound by the rental contract because (1) the bridge was essential to the operation of the road, and (2) the receiver adopted the contract by operating under it.

■ The general rule applicable to a situation of this kind is well settled. A receiver appointed by a court of equity does not take or hold as an assignee. He is the hand of the court appointing him, and his custody is that of the court and is for the benefit of all who are interested in the estate. Such a receiver, taking possession of leasehold property under the order of a court of equity, may retain possession of such property for such reasonable time as will enable him to intelligently elect whether the interest of his trust will be best subserved by adopting the lease and making it his own, or by returning the property to the lessor. During such time he is not bound by the contract, but his relation to it is in suspense until by word or act he adopts or renounces it. Where the subject-matter of the contract is such that it is necessary or desirable for the receiver to make use of its advantages during the period of suspension, he may do so without necessarily committing himself to its adoption. United States Trust Company v. Wabash Western Railway Company, 150 U.S. 287, 299, 300, 14 S.Ct. 86, 37 L.Ed. 1085; Carswell v. Farmers' Loan & Trust Co. of New York et al. (C.C.A.6) 74 F. 88, 91; City and County of Denver v. Stenger (C.C.A.8) 295 F. 809, 817; Quincy, Missouri & Pacific Railroad Co. v. Humphreys, 145 U.S. 82, 101, 12 S.Ct. 787, 36 L.Ed. 632; General Finance Corporation v. New York State Railways (C.C.A.2) 54 F.(2d) 1008, 1009; Gaston et al. v. Rutland R. Co. (C.C.A.2) 35 F.(2d) 685; Madden v. La Cofske (C.C.A.9) 72 F.(2d) 602, 604, 605, 95 A.L.R. 370.

■ The receiver's operation under the lease contract from November 12, 1930, to April 1, 1932, was not an adoption of the contract, since the reasonable time within which he might adopt or reject the contract was, by agreement between the receiver and the Bridge Company, suspended during that time, and the court in its orders direct-

ing payment of rentals expressly stated that such payment should not constitute an affirmance of the contract. The reasonable time for adoption or rejection commenced to run April 1, 1932, when the receiver notified the Bridge Company to that effect.

■ The question as to what constitutes a reasonable time is to be determined from all surrounding facts and circumstances. General Finance Corporation v. New York State Railways (C.C.A.2) supra, 54 F.(2d) 1008, 1009; Westinghouse Electric & Mfg. Co. v. Brooklyn Rapid Transit Co. (C.C.A. 2) 6 F.(2d) 547–549; Carswell v. Farmers' Loan & Trust Co. of New York et al. (C. C.A.6) supra, 74 F. 88, 91, where it was said: "The suggestion that the retention by the receiver of the possession of this property for 10 months was unreasonable and unnecessary to enable him to make an intelligent election is, we think, untenable in view of the circumstances of this case." In the case of General Finance Corporation v. New York State Railways (C.C.A.2) supra, 54 F.(2d) 1008, eleven months was held not an unreasonable time. In United States Trust Company v. Wabash Western Railway Company, supra, 150 U.S. 287, 14 S. Ct. 86, 37 L.Ed. 1085, the receivers were appointed in May, 1884, and one of the lease contracts there involved was disaffirmed nearly twenty months thereafter.

■ Undoubtedly the receiver and the court below continued the unprofitable operation of the line in the hope that times and conditions might so change that a purchaser could be found for it as a going concern, or that the company might in some way be reorganized. To abandon the line meant that its value as a transportation system was lost. To exercise an intelligent judgment required operation during a test period sufficiently long to demonstrate whether the situation was hopeless or otherwise. It is obvious that the court below never intended to permit the receiver to adopt this contract, and that the receiver had no intention of adopting it. The court held that the time within which the contract was rejected by the receiver was not unreasonable, and we agree. Moreover, had the Bridge Company desired a prompt election by the receiver, there was no reason why it could not have applied to the court for an order requiring him to elect. It was probably hopeful, like others interested in the property, that an abandonment of the line could be avoided and that its bridge would continue to be used.

■ 2. The Bridge Company contends that, under its contract with the Interurban Company, it had an equitable lien upon the corpus of the trust estate in the hands of the receiver for the stipulated rental for the entire time that the receiver used the bridge, which lien was superior to that of the bondholders. This, because the contract provided that the stipulated rental should be deemed an operating expense and that the Interurban Company's rights under the contract should be considered an asset which might be included in any mortgage upon its property and that any purchaser at foreclosure sale under such a mortgage should succeed to all of the rights and obligations of the Interurban Company under the contract.

It seems clear to us that there is nothing in these provisions of the contract which would justify the conclusion that the Bridge Company had an equitable lien for its rentals upon the property of the Interurban Company. The provisions referred to disclose no intention to make any property, real or personal, or any fund described or identified, a security for the rentals provided for in the contract, nor do they constitute a promise to convey or assign or transfer the property of the Interurban Company, or any part of it, as security for such rentals. There is lacking these essential elements of an equitable lien. Pomeroy's Equity Jurisprudence, p. 2962, § 1235; Walker v. Brown, 165 U.S. 654, 664, 665, 17 S.Ct. 453, 41 L.Ed. 865; Pierce v. National Bank of Commerce in St. Louis (C.C.A.8) 268 F. 487, 494; Jackman v. Newbold (C.C.A.8) 28 F.(2d) 107, 111, 112, 62 A.L.R. 729; State Central Sav. Bank v. Hemmy (C.C.A.8) 77 F.(2d) 458, 460.

■ The Bridge Company claims that it is entitled to preferential payment of its stipulated rental (1) because the trustees under the mortgage and the bondholders took with notice of the right of the Bridge Company to have the rental paid as an operating expense, and (2) because of the increased construction and maintenance cost incurred by the Bridge Company on account of the contract, and (3) because the trustees and bondholders enjoyed the benefits of the contract up to June 25, 1933, the date when the bill of foreclosure was filed.

We see no merit in these contentions. Notice of the contract which provided for no lien was not notice of a lien. The fact that the contract had caused expense to the

Bridge Company for construction and maintenance before receivership was nothing that affected the receiver or the rights of bondholders, nor did the use of the bridge by the receiver change the relation of rental charges to mortgage bonds in so far as priority of payment of contract rental was concerned.

3. The Bridge Company was entitled to a reasonable rental for the use of the bridge from April 1, 1932, to March 10, 1933. The trustees under the mortgage and the bondholders' committee contend that the Bridge Company was entitled to nothing after April 1, 1932, and that it should be required to refund $9,139.27 because the operation of the property created a deficit and there were no earnings attributable to the use of the bridge. They also contend that the fair rental value from April 1, 1932, to March 10, 1933, could not in any event exceed $3,175.60, the actual cost of maintenance of the bridge, since the Bridge Company could not have rented the bridge to any other person, and therefore it was overpaid to the extent of at least $5,963.67, which it should return.

The theory of the bondholders' committee that the Bridge Company is entitled to nothing is based on cases all of which involve the rental of extensive railway trackage constituting more or less complete transportation systems of themselves, the separate earnings of which were determinable with reasonable accuracy, and the use of which trackage was shown to have produced nothing for the receiver. The rule announced in those cases, we think, is not applicable to a rental contract covering a bridge, depot, terminal, or rolling stock. It is true that in this case the contract covered more than the bridge itself, in that it included tracks of the Bridge Company utilized by the Interurban Company in approaching the bridge, but, obviously, the main purpose of the contract was to secure a passage over the Missouri river; and the use of some seven miles of track of the Bridge Company was merely incidental to that purpose.

We think the rule applicable here is that announced in Carswell v. Farmers' Loan & Trust Co. of New York et al. (C.C.A.6) supra, 74 F. 88, which case bears a close analogy to this and in which it was held that a receiver was obligated to pay a reasonable rental for a depot, and not the rental stipulated in a lease. See, also, City and County of Denver v. Stenger (C.C.A.8) supra, 295 F. 809, and Kneeland v. American Loan & Trust Co., 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379.

The receiver and the court below both regarded the per car passage charge as a fair measure of the reasonable value of the use of the bridge. The problem was one with which they were entirely familiar. We think there is no reason for disturbing the conclusion reached by the lower court.

The decree is affirmed.