144 So.2d 581 (1962)
Charles F. WEBER
v.
PRESS OF H. N. CORNAY, INC.
No. 639.
Court of Appeal of Louisiana, Fourth Circuit.
July 2, 1962.
Rehearing Denied October 5, 1962.
Certiorari Denied November 27, 1962.
*583 Richard B. Montgomery, Rudolph J. Weinmann and Peter H. Beer, New Orleans, for R. V. Whittaker, receiver for Press of H. N. Cornay, Inc.
Moise S. Steeg, Jr., New Orleans, for National Printcraft Industries, Inc.
James D. Rives, Jr., New Orleans, for Harold N. Cornay.
P. Fred Siegel, New Orleans, for D & W Paper Co., Inc.
Chaffe, McCall, Phillips, Burke & Hopkins, George W. Pigman, Jr., New Orleans, for The Cottrell Co., appellee.
Lienhard T. Kuhner and Guy Scoggins, New Orleans, for Commercial Credit Corp., appellee.
Polack, Rosenberg, Gex & Rittenberg, Robert G. Polack, New Orleans, for Gulf States Land & Industries, Inc., intervenor and appellant.
Melvin P. Barre, and Nicaud & Brister, Rene R. Nicaud & Hugh H. Brister, New Orleans for Reserve Telephone Co., Inc., intervenor and appellant.
Monroe & Lemann, Walter J. Suthon, III, New Orleans, for Whitney National Bank, intervenor and appellant-appellee.
Before REGAN and SAMUEL, JJ., and LUTHER E. HALL, J. pro tem.
REGAN, Judge.
This appeal was prosecuted from a judgment amending and homologating a provisional account, filed by the judicial receiver of the Press of H. N. Cornay, an insolvent corporation, which was placed in receivership during the month of July 1959. The business was continued in the hope of making a success thereof by R. V. Whittaker, receiver, under the supervision of the court, for approximately seventeen months, and was finally closed on December 31, 1960 when it became obvious that the receiver was unable to restore it to a sound financial basis.
On March 6, 1961, a judgment was rendered which permitted the receiver to sell all the stock and physical assets which formed part of the Cornay plant, located in Reserve, Louisiana, to National Printcraft Industries, Inc., for $175,000, and the sale was consummated in conformity with this decree. The above amount, together with other funds then in the custody of the receiver, brought the total cash balance to $187,396.27, according to his provisional account.
Several oppositions were filed to the homologation of the account; however, the trial court only amended it to reduce the fees of the attorneys and the receiver and to decrease the claim of the Whitney National Bank as an ordinary creditor from $158,096.10 to $151,346.39.
The judgment further dismissed the oppositions of Gulf States Land & Industries, the lessor of the building in which the corporation conducted its business, and of the Reserve Telephone Company, the lessor of the telephone equipment which serviced the corporation.
From that judgment, three creditors have appealed, namely, the Whitney National Bank, Gulf States Land & Industries and the Reserve Telephone Company.
For the purpose of endeavoring to preserve the clarity of a rather complicated receivership proceeding, we shall discuss the claim of each creditor separately.

Gulf States Land & Industries
On December 20, 1957, the Press of H. N. Cornay entered into a written contract of lease with Gulf States Land & Industries, Inc., hereinafter referred to as opponent, wherein the lessor agreed to construct a building on four acres of unimproved land in Reserve, designed specifically for occupancy by the lessee, the Press of H. N. *584 Cornay "for the purpose of conducting a label manufacturing and printing operation, and operations relating thereto". The lease was to extend over a period of twenty-five years and its term began on the date the building was completed, namely, August 15, 1958; the lessee agreed to pay an annual rental therefor of $32,130.00 in equal installments of $2,677.50 per month.
On July 17, 1959, the Press of H. N. Cornay was placed in voluntary receivership and the receiver was authorized by the court to continue to conduct the business thereof. From that date until December 31, 1960, the receiver endeavored to operate the firm and consequently occupied the Reserve plant. Rentals were paid to the opponent lessor during the period that the business was actually operated by the receiver thereof.
In January of 1961, the receiver notified the lessor that he was cancelling the lease because he intended to discontinue business operations and on January 16, 1961, he obtained a court order, issued ex parte, ratifying the cancellation of all leases in effect on December 31, 1960.
On February 16, 1961, the receiver petitioned the court for authority to sell the assets of the press, located in the Reserve Building, for the sum of $175,000, which was opposed by the lessor. In the alternative, the lessor requested that should the court order the sale as prayed for, then the receiver should be ordered to retain the proceeds thereof, which were subject to its lessor's lien and privilege.
Included in the assets to be sold were a five-color press and an "A-bracket trimmer", machinery upon which the Commercial Credit Corporation possessed a chattel mortgage, which had been given as security for a loan to the corporation, consummated before Cornay was placed in receivership. This mortgage holder also opposed the proposed sale, predicated on the fact that no provision was included in the terms thereof for satisfying the balance of its loan in the amount of $62,281.40. In the alternative, this creditor requested that the court order a separate sale and appraisal of its property.
A similar opposition was filed by the Cottrell Company, which had sold a two-color press to the corporation on credit and obtained as security therefor a note and chattel mortgage thereon. When the opposition was filed, there existed an unpaid balance of $46,811.22. This mortgage creditor also prayed that the receiver's petition to sell the assets be denied and, in the alternative, requested a separate sale and appraisal thereof.
On March 3, 1961, a hearing was held to determine whether the receiver should be permitted to sell the assets of the defunct corporation. The evidence adduced therein established that the receiver was able to obtain the most favorable price by selling the plant equipment en globo. Therefore, the trial court heard testimony in order to fix the value of those pieces of equipment upon which the mortgage creditors held chattel mortgages. The testimony disclosed that the equipment subject to Commercial's mortgage was valued far in excess of the balance due on the note which the mortgage secured and the court therefore ordered its worth fixed at $62,281.40.
At this time, the Cottrell Company and the receiver entered into an agreement wherein the mortgage creditor agreed to accept the sum of $25,000 in full settlement of its note, which reflected an outstanding balance of $46,811.22. Therefore the court conducted an inquiry into the value of the two-color press, which was subject to the Cottrell mortgage, as to whether it was worth at least $25,000. The expert testimony revealed that its value was in excess thereof.
When the court assigned the respective values to the mortgaged equipment, it ordered that the equipment be made available for further appraisal if any of the other opponents desired to contest the value as fixed and offer evidence, if they could, to have it lowered. The lessor opponent herein, *585 Gulf, was represented at the time this judgment was rendered and the court offered any opponent thereof the opportunity to obtain additional appraisals.
On March 21, 1961, opponent notified the receiver of its intention to terminate the lease as of December 31, 1962, in conformity with the terms thereof which afforded the lessor the right to cancel if the lessee was in default.[1] The contract provided that this would have the effect of terminating the lease; however, the lessee's liability for breach thereof would not be affected thereby.
The lease further prescribed the lessee's liability in the event of a breach by the lessee as the discounted value of the aggregate amount of unaccrued rentals that would be due under the contract for the balance of the term of the lease.
On April 17, 1961, Whittaker filed a provisional account of the Press of H. N. Cornay in Receivership, in which is included a proposed distribution of $16,065.00 to the opponent as a preferred creditor. This represented six months' rent which the receiver contends is due the opponent in conformity with a statutory lien, which confers upon the lessor of a building, used in whole or in part for mercantile purposes, the status of a privileged creditor and limits its privilege to the collection of six months' rent.
The receiver further listed the opponent as a common creditor, possessing an unliquidated claim; therefore, he excluded the opponent from participating in the pro-rata distribution which he had outlined for ordinary creditors. (which was 18% of the amount of each one's aggregate claim).
On April 21, 1961, the lessor filed an opposition to the provisional account in which it asserted that the receivership was indebted unto it in the amount of $197,922.50, and that it possessed a valid lessor's lien on the assets sold for $175,000, which entitled it to receive the entire proceeds of the sale in preference to all other secured and ordinary creditors.
The lessor itemized his claim as follows:

 Taxes on property 1961 2,500.00
 Taxes on property 1962 2,500.00
 Insurance premiums on bldg.
 1961 700.00
 Insurance premium on bldg.
 1962 700.00
 Rent 1961 32,130.00
 Rent 1962 32,130.00
 Discounted value of aggregate
 rent due from January
 1, 1963 through July
 31, 1983 127,662.00
 ___________
 $197,922.00

When the trial court held a hearing on the various oppositions to the homologation of the receiver's provisional account, the lessor opponent's president, Earle N. Martin, Sr., who was qualified as an expert in the field of accounting, explained the method used to compute the lessor's claim for damages caused by the lessee's breach, and established the validity of the individual items comprising the claim.
However, the trial court dismissed the lessor's opposition and homologated the provisional account with respect to the proposed distribution to it.
Thus, the trial court concluded that the provisions of LSA-R.S. 9:3241 were applicable to the opponent lessor in this proceeding by virtue of its homologation of the proposed distribution of six months' rent or *586 $16,065.00 to the lessor as a preferred creditor. The statute provides in part:
"The lessor's privilege and right of pledge under any lease, on any building used wholly or in part for mercantile purposes * * * shall not extend, in the case of the failure or death of the lessee, to secure rent for a term of more than six months after death or failure. * * *" (Emphasis added)
Counsel for this opponent and appellant maintains that the trial court erred in concluding that the building leased was "used wholly or in part for mercantile purposes * * *." He insists that the Press of H. N. Cornay was a manufacturing business, wherein the items that were sold were either manufactured entirely from raw materials or were processed in some measure at the plant before they were delivered to customers. Counsel argues that the word "mercantile" applies only to businesses that buy a finished product at wholesale and resell it at a retail price.
H. N. Cornay, Sr., president of the defunct corporation, testified that the principal business conducted by his firm was that of soliciting sales for, and then manufacturing, printed materials of various sorts that were designed for the use of one particular customer. He also related that some items which were sold were purchased in finished form from an outside source and then sold at a mark-up by Cornay to its customers. When such items were ordered from other firms, sometime they were shipped directly to the customer and at other times they were initially shipped to the Reserve plant and subsequently delivered to the customer.
On cross examination, counsel for opponent produced a list of sales under $100, made by the Press of H. N. Cornay over a six month period prior to its receivership status and asked Cornay to state which items thereon were sales of finished products that it had ordered from another manufacturer and which items had first been delivered to the Reserve plant before they were sent to the customer. Since two years had elapsed, Cornay said that he could not pinpoint which orders had been physically shipped to the Reserve plant, but he was emphatic in insisting that some had been.
Cornay further related that his company printed sets of plantation prints which retailed for the sum of $2.00 and that innumerable customers had come to the plant to purchase them directly.
His testimony also confirmed as a fact that all of the firm's sales were made on a retail, as distinguished from a wholesale, basis.
Counsel for opponent, to substantiate his contention that the trial court erred in concluding that the building leased was "used wholly or in part for mercantile purposes", relies primarily on the rationale emanating from the case of International Harvester Co. of America v. Shreveport Nu-Grape Bottling Company[2], the author of which reasoned that the statutory limitation of the lessor's lien did not apply to a defunct bottling company which was engaged in manufacturing soft drinks and selling them wholesale to customers for resale at retail prices.
The International Harvester case is distinguishable from the one now before us in that the bottling company operated strictly on a wholesale basis and bought no finished products for resale at retail prices, while the Cornay concern sold its products on a retail basis and handled a small amount of retail sales of products manufactured by other companies.
We are of the opinion that the evidence proponderates to the effect that the Press of H. N. Cornay did conduct a portion of its business in the Reserve plant so that it would conform even to opponent's narrow definition of "mercantile purpose", namely, in purchasing finished products from other *587 producers, storing them in the Reserve plant and then selling them at a marked-up price to other customers. Cornay's testimony is uncontradicted and he conducted the business for many years so he is certainly in the best position to describe its operations.
However, were we to assume arguendo that the Cornay Press engaged solely in the business of manufacturing printed material and selling it on a retail basis, a view which opponent believes to be most favorable to his case, we would still be compelled to conclude that such an operation was, in substance, a mercantile pursuit.
The most recent definition of a mercantile establishment, which appears in a Louisiana case, is found in Sherrouse Realty Company v. Marine.[3] That litigation involved an interpretation of a restrictive covenant contained in the sale of property to the effect that:
"No store, building, filling station, dairy or other mercantile establishment shall be built on any of this property."
The defendant therein constructed a concrete plant on the property in question, where it manufactured, stored and sold concrete products. The court reasoned that the defendant had violated the restrictive covenant since the subdivider of the land, who intended that it be used for a residential subdivision, had prohibited the erection of retail stores in order to maintain its residential character, and obviously had intended to prevent a manufacturer from operating a business on the site, since that type of firm was far more obnoxious in a residential area.
The court further concluded that the concrete manufacturing plant was a "mercantile establishment", for it stated:
"Similarly, a mercantile establishment is one pertaining to trade and to the buying and selling of commodities. Under this definition it has been held that a corporation organized to make baker's goods and restaurant supplies and to sell them was organized for mercantile purposes. 27 Words and Phrases, Perm.Ed., p. 59, verbo `Mercantile'." See H. H. Kohlsaat & Co. v. O'Connell, 255 Ill. 271, 99 N.E. 689.
Therefore, we are of the opinion that the trial court properly upheld the receiver's six months' limitation of the lessor's privilege on the movables contained in the plant, which had been sold.
One of the alternative contentions of the opponent is that in the event its privilege is subject to the above quoted statutory limitation, then its status is that of a receivership creditor and its claim for the entire amount due, predicated on the lessee's breach of contract, should be paid in preference to the mortgage creditors and the pre-receivership ordinary creditors.
The opponent's claim to priority status as a receivership creditor is predicated on its assertion that the contract of lease is not divisible and that the receiver adopted it and assumed all the obligations thereunder as is evidenced by his retention of the premises and operation of the business for seventeen months before obtaining an order for its termination, and also by permitting the physical assets of the insolvent corporation to remain on the premises sometime thereafter.
Counsel argues that the receiver did adopt the contract of lease which, he asserts, is supported by the fact that the receiver treated the lease as an asset of the business during an early period in the receivership when he endeavored to sell it as a going concern to a vendor who had proposed to assume all the obligations of the business. (The prospective purchaser of the Cornay Press, as a going concern, withdrew the offer to purchase and another similar offer could not be obtained by the receiver. Therefore, the sale of the physical assets was made approximately 18 months later.)
*588 We agree with the contention urged by counsel for the opponent lessor to the effect that a corporation lessee is not relieved of all obligations under a pre-receivership contract by the appointment of a receiver. We also agree that it is not permissible for a receiver to divide a contract by accepting a portion thereof and rejecting the balance.
However, the issue posed for our consideration is whether the receiver in this instance impliedly adopted the lease agreement originally executed by Cornay as lessee.
It is a well recognized principle of law that a receiver has the right to either adopt or reject executory contracts of the corporation entered into prior to the receivership;[4] however, the mere fact that the receiver takes possession of the premises for a reasonable time and attempts to restore the business to a sound financial footing does not in itself constitute an implied adoption of the contract of lease.
This principle was succinctly stated in North Kansas City Bridge and R. Co. v. Leness[5], wherein the author asserted that:
"* * * A receiver appointed by a court of equity does not take or hold as an assignee. He is the hand of the court appointing him, and his custody is that of the court and is for the benefit of all who are interested in the estate. Such a receiver, taking possession of a leasehold property under the order of a court of equity, may retain possession of such property for such reasonable time as will enable him to intelligently elect whether the interest of his trust will be best subserved by adopting the lease and making it his own or by returning the property to the lessor."
However, if the receiver retains the premises beyond a reasonable period of time, his retention will be deemed to be an implied adoption of the contract of lease.[6]
Therefore, we must decide whether the receiver retained the premises for an unreasonable length of time before conceding failure of the experimental operation of the corporation in receivership, and the question as to what constitutes a reasonable time must be determined from all the surrounding facts and circumstances in the case before us.[7]
In this instance the receiver initially endeavored to operate the Press of H. N. Cornay as a going concern and later sought to consummate a sale of the entire business. Had he been successful in either endeavor, his administration would have inured to the benefit of all the creditors. On the other hand, the lessor opponent was actually benefited, rather than injured by the receivership, since it was paid full rent for each month that the receivership existed. The long period of delay between the inception of the receivership and the final disposition of the physical assets is explained by the obvious difficulty in disposing of either the business as a going concern or the physical assets thereof, and we do not think that the experimental effort of operating the receivership was unreasonably long.
It has also been pointed out by judges who have authored similar opinions that the complaining creditor who finds himself in the same position as the lessor opponent in this case had the right to seek the assistance of the court in requiring the receiver to either accept or reject the contract of lease during the course of the receivership.[8]
Counsel for the opponent relies primarily on the case entitled Jacob v. Roussel,[9] to *589 support his contention that the receiver did adopt the lease. In that case, Uncle Sam Planting Company leased from the plaintiff (owner) a rice plantation for the years 1920 to 1923, both inclusive. During the year of 1920, the corporation went into receivership, and the receiver sought and obtained authority to operate the plantation for the year 1920 and paid the annual rental. The plantation was surrendered to the plaintiff at the end of the first year and suit was brought for the difference between the rentals for the years 1921 through 1923 and the amount for which plaintiff was successful in renting the property to a subsequent tenant. The court permitted the plaintiff to recover the difference between the rent due under the lease from the Uncle Sam Planting Company and the lower rental obtained from the last tenant.
But the distinguishing characteristic in the Jacobs case was that the land used for planting rice is fertile for one year and fallow for one or two years thereafter. The receiver had operated the plantation during a productive year. The court therein decided that the equities demanded that the owner be compensated for the loss of rent under the contract of lease and in reaching that result rationalized as follows:
"And our conclusion is that the receiver, having taken advantage of the lease for the year when a good crop could be raised, was not at liberty to surrender the land for the years when the crop might be poor. This appears to us the only equitable solution of the issue; and, as we find no positive law or jurisprudence in point, we must adopt it. R.C.C. [Art.] 21."
Therefore, the Jacobs case, decided in conformity with equity, is clearly distinguishable from this one, for the lessor herein obviously profited from the receivership proceeding.
Since we have concluded that the receiver did not adopt the contract of lease, we must affirm the trial court's dismissal of the opponent's claim as a receivership creditor entitled to priority over ordinary pre-receivership creditors.
Finally, the lessor opponent contends that the amount of his claim for the lessee's default is liquidated, since the contract of lease fully sets forth a method to compute the amount due as a result of the breach.
We agree with the foregoing contention since the lease itself supports the argument and opponent further produced the expert testimony of an accountant to establish the accuracy of the computations contained in the lessor's petition of opposition. This testimony was uncontradicted and we are of the opinion that the lessor opponent is entitled to the pro-rata share of its proven damages as is any other ordinary creditor of the pre-receivership business operation.
In connection with the lessor opponent's demand that it be recognized as a creditor whose lien primed all the secured and unsecured creditors, counsel asserted that both mortgage creditors, Commercial Credit Company and the Cottrell Company, lost their privileged rank by permitting the property upon which their chattel mortgages rested to be sold en globo with all the other assets of the business.
We treat this contention at this point of our opinion because, if successful, it will increase the amount of funds available for distribution to ordinary creditors by approximately $87,000 and the lessor opponent as an ordinary creditor is substantially affected by our resolution of this issue.
It will be recalled that both mortgage creditors opposed the receiver's petition to sell the assets en globo and in the alternative, demanded a separate sale and appraisal of the machinery upon which they possessed chattel mortgages. At the hearing called for the production of evidence by opponents to the sale to show cause why it should not be authorized, the value of the Commercial Credit Corporation's equipment was determined to be in excess of $62,281.40, and that of the Cottrell Company *590 was fixed at $25,000, both amounts being satisfactory to the mortgage creditors.
Shortly after a judgment was rendered authorizing the receiver to sell the assets en globo, both mortgage creditors entered into a stipulation wherein they agreed to waive their right to appeal the judgment or take writs therefrom. They specifically stated they did not waive their claims as secured creditors or rights they might have in the subsequent ranking of privileges.
The opponent lessor contends that by failing to prosecute an appeal from the judgment ordering the sale en globo, both mortgage creditors lost their rights as secured creditors since there is no way of determining the price that the mortgaged machinery brought at the sale. Counsel relies on the rationale of LSA-C.C. Art. 3228, which reads:
"Loss of privilege by sale with other property of purchaser

"But if he allows the things to be sold, confusedly with a mass of other things belonging to the purchaser, without making his claim, he shall lose the privilege, because it will not be possible in such a case to ascertain what price they brought."
The jurisprudence interpretative of this article has uniformly reasoned that the holder of a vendor's privilege or a mortgage creditor loses his privilege when the property which secures payment of the indebtedness is sold en globo, together with the other assets and the value of the property subject to the lien or mortgage cannot be ascertained.[10] However, in the cases holding the privilege was lost after an en globo sale, the secured creditor had not endeavored to obtain an appraisal of the property which secured his debt prior to the sale. Several decisions have pointed out that had the privileged creditor obtained an appraisal of the mortgaged equipment prior to the sale, then the privilege would not be lost, despite the fact that the mortgaged equipment formed part of an en globo sale.[11]
In this case the mortgage creditors did secure a separate appraisal and the values were confirmed by a judgment of court. There is no doubt that both entered into the stipulation to protect their rights in the event that another creditor would attempt to deprive them of their privileged claims on the very basis that the opponent lessor now urges.
The record discloses that all of the creditors profited by virtue of the inclusion of this machinery in the en globo sale since it was this inducement which prompted the purchaser to accept some of the other items.
Further, both mortgage creditors were satisfied with the values fixed by the judgment of the lower court and an appeal therefrom would have been pointless. To reiterate for the purpose of emphasis, the other opponents were afforded an opportunity by the trial court to prove that the values fixed in its judgment were excessive and no one, including the lessor opponent, took advantage of this offer. In addition thereto, the lessor opponent also possessed the right to appeal from that judgment authorizing the sale and fixing the values, but failed to do so. Therefore, we are of the opinion that its contention relative to the mortgage creditors is without merit.
After the lessor opponent's appeal from the judgment homologating the provisional account was lodged in this court, it entered *591 into another agreement to lease its building beginning September 1, 1962 at an alleged net rental of $2,083.33 per month and therefore asserted in this court that its original claim should be reduced as a result thereof from $197,922.50 to $138,883.75. Since we have concluded that the opponent should share on a pro-rata basis with the ordinary creditors, we think this aspect of the case should be remanded to the trial court so as to permit the introduction of further evidence to prove or disprove the sufficiency of the foregoing remittitur.

Reserve Telephone Company
On January 7, 1958, the Press of H. N. Cornay entered into a written contract for the lease of telephone equipment and service from the Reserve Telephone Company, Inc., for a period of ten years at a monthly rental of $714.98. In conformity with this agreement the lessor installed a special telephone system, tailored exclusively to the lessee's needs. After the receiver assumed the operation of the corporation in July of 1959, he paid the monthly rental due the lessor for the service and equipment until December 31, 1960, at which time the receiver's effort to operate the business successfully was terminated.
In January of 1961, the receiver informed the telephone company that he was cancelling the lease for its services and this action was ratified by an ex parte court order.
When the receiver filed his provisional account, the Reserve Telephone Company was listed as an unliquidated creditor and the telephone company, hereinafter referred to as opponent, filed an opposition thereto, wherein it asserted that the receivership owed opponent the sum of $50,484.77. Its claim is predicated on these figures:

92 months on unexpired
 term of contract at $714.98
 per month $65,778.16
$65,778.16 discounted at 6% 50,484.77

Opponent asserted that its claim should be paid in full and given priority over those of all the secured and ordinary creditors. Its opposition was dismissed by the trial court.
This opponent initially asserts, as did the lessor of the building, that the trial court erred in concluding that the receiver had not adopted the executory contract between the opponent and the Press of H. N. Cornay for its telephone equipment and services.
For the reasons set forth hereinabove in rejecting the same contention by Gulf, we conclude that the receiver did not adopt the executory contract and, therefore, any damages incurred by the opponent as a result of the default by the lessee are due it as an ordinary creditor entitled to a prorata share of the cash on hand, which the receiver has accumulated for the purpose of distribution.
However, we do believe that the trial court erred in homologating that portion of the provisional account which catagorized the opponent telephone company as a common creditor possessing an unliquidated claim.
The record contains a copy of the contract between the Press of H. N. Cornay and the opponent which discloses that the telephone services were to extend over a period of ten years. In addition thereto, the record is embellished with testimony to the effect that the communication system installed was especially designed to conform to the requirements of the Cornay firm. Since the value of the unaccrued rentals has been mathematically computed, the opponent's claim is not unliquidated and the receiver should not be authorized to distribute the available funds to all other ordinary creditors without first ascertaining the pro-rata share due to the opponent telephone company as an ordinary pre-receivership creditor, possessing a liquidated claim.
In its claim for damages, the opponent telephone company asserted that it was due $65,778.16, discounted at 6%, or the sum of $50,484.77. Uncontradicted testimony *592 was introduced to prove the accuracy of this computation.
We are of the opinion that the total unaccrued rental was accurately computed; however, the opponent's claim therefor should be discounted at eight percent instead of six percent to establish the proper amount of its claim as an ordinary creditor. The jurisprudence of this state is uniformly to the effect that a claim for future rent should be discounted at eight percent,[12] rather than at six percent.
The claim of the opponent telephone company as an ordinary creditor must be further reduced by virtue of a remittitur filed by the opponent while this appeal was pending. The opponent revealed that it had executed a lease agreement with another lessee for a period of five years beginning September 1, 1962 at a monthly rental of $223.75. Opponent therefore asserts that a remittitur of $11,377.69 should be allowed, which would reduce its total claim to $39,107.08.
Since we have concluded that the opponent should share on a pro-rata basis with the ordinary creditors, we are of the opinion that this aspect of the case should also be remanded to permit the introduction of additional evidence to (1) prove the sufficiency or insufficiency of the voluntary remittitur and (2) establish the value of opponent's claim, when the proper remittitur is deducted, discounted at 8%.
Opponent asserts that the trial court erred in recognizing the lien creditors and approving priority payments to them. He insists that the failure of the mortgage creditors to foreclose and the lessor to force a sale of the movables upon which his lien rested at the inception of the receivership, constituted a waiver of their respective privileged ranks to all receivership creditors. In view of the fact that we have concluded that the opponent is not a receivership creditor, it is unnecessary for us to engage in a protracted discussion of this contention.
However, in the alternative, opponent telephone company asserts that should this court affirm the homologation of the account with respect to the proposed distribution to the lessor of the building and the mortgage creditors as privileged creditors, it should amend the account by ordering these secured creditors to pay their proportionate share of the cost of the receivership. Opponent insists that the privileged creditors incurred liability for a proportionate share of the expenses by failing to foreclose on their mortgages and by permitting the business to be conducted by the receiver in the leased premises for a period of seventeen months.
Our review of the jurisprudence on this point discloses that opponent's contention relative to costs of the receivership, namely attorneys' and receiver's fees, is well founded in law.
In the case of In re Receivership of Farmers' Union Warehouse,[13] the organ of the court rationalized thus:
"As the mortgage creditor did not see fit to foreclose the mortgage, but preferred to let the receiver administer and sell the mortgaged property under the order of court, the proceeds of the sale should bear their proportionate share of the fees allowed the receiver and his attorney."
This rationalization also prevailed in the case of International Harvester Co. of America v. Union Irr. Co.,[14] wherein the court pronounced:
"With respect to the failure of the holders of vendors' liens upon real or immovable *593 property to contribute to the costs of the receivership, it is sufficient to say that they never consented to or acquiesced in the appointment of the receivers, or of their administration; but on the contrary * * *, they persisted in foreclosing on their claims * * *. This they had a right to do, in view of the nature of their claims; and only by sitting quietly by and permitting the receivers to administer the estate without such assertion could they have been made liable for any part of such expense." (Emphasis added)

Whitney National Bank
In the receiver's provisional account, the Whitney National Bank is listed as a common creditor possessing a claim of $158,096.10 against the defunct corporation. The receiver proposed to pay 18% of the total amount due to all common creditors, which, in the bank's case, amounted to $28,457.30.
The D & W Paper Company, Inc., another common creditor, filed an opposition to this item, asserting that it was subject to a credit of $6,749.71, representing payments received by the bank from Harold N. Cornay, a surety on this indebtedness. The judgment of the lower court sustained the opposition and reduced the claim of Whitney as an unsecured creditor to $151,346.39.
The paper company also opposed the amount for other reasons, which the trial court dismissed, and since it has not answered the appeal, it is unnecessary to discuss this second contention.
However, the bank has appealed from the judgment which reduced its participation in the distribution to common creditors from 18% of $158,096.10 to 18% of $151,346.39.
Counsel for the bank asserts that the account as homologated has the effect of favoring other common creditors of the insolvent corporation, despite the fact that the principal creditor has only been partially compensated for its loss on the debt secured by the surety. This result, he argues, violates one of the principles of our law of suretyship.
Cornay, the surety whose partial payment was deducted from the bank's original indebtedness by the trial court, has presented no claim for the amount paid against the insolvent estate, and this he is not legally entitled to do until the obligation of the principal creditor has been satisfied in full.
LSA-C.C. Art. 2161 provides in part:
"Subrogation takes place of right.
* * * * * *
"3. For the benefit of him who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it."
However, before the surety is entitled to recover any amount paid to the principal creditor by virtue of the legal subrogation, the creditor's claim must be fully satisfied. LSA-C.C. Art. 2162 reads:
"The subrogation established by the preceding articles, takes place as well against the sureties, as against the debtors. It can not injure the creditor, since, if he has been paid but in part, he may exercise his right for what remains due, in preference to him from whom he has received only a partial payment."
We have applied the rationale of the foregoing codal articles to this aspect of the case, and as a result thereof we are compelled to conclude that the reduction of the Whitney Bank's claim as a common creditor was improper. If the surety, who has a legal subrogation to the principal creditor's right once the debt is fully satisfied, cannot participate in the distribution of the proceeds on a pro-rata basis until the bank has been fully paid, certainly the partial payment cannot inure to the benefit *594 of the other ordinary creditors of the corporation in receivership.[15]

Decree
For the reasons assigned, the judgment appealed from is:
(1) Affirmed insofar as it approves the payment of $16,065.00 to the lessor, Gulf States Land & Industries, as a privileged creditor for six months' rent and amended to deduct therefrom the lessor's proportionate share of expenses incurred in the administration of the receivership.
(2) Reversed insofar as it homologated the provisional account which classified the lessor. Gulf States Land & Industries, as a common creditor with an unliquidated claim for the balance due under the contract of lease that was not satisfied by the lessor's privilege.
(3) Set aside in part and the case is remanded to permit any interested party an opportunity to contest the sufficiency of Gulf's voluntary remittitur, filed in this court shortly before this matter was fixed for argument. The remittitur, when proven with that certainty required by law, together with the amount allowed Gulf as a privileged creditor, is to be deducted from the lessor's total claim for breach of contract and the account should be recomputed to permit its pro-rata sharing in the proceeds available for distribution to pre-receivership common creditors.
(4) Reversed insofar as it homologated the provisional account which classified the lessor, Reserve Telephone Company, as a common creditor with an unliquidated claim for the balance due under the contract of lease providing for the rental of telephone equipment.
(5) Remanded to permit any interested party an opportunity to contest the sufficiency of the Reserve Telephone Company's voluntary remittitur, also filed herein shortly before this matter was argued in this court. The remittitur, when proven, is to be deducted from the telephone company's claim and the telephone company should be permitted to introduce evidence to establish the value of its aggregate claim for unaccrued rentals, discounted at 8%, rather than 6% as the telephone company initially proposed, and then participate as an ordinary creditor in the distribution of funds available on a prorata basis.
(6) Affirmed insofar as it approves the payment of $62,281.40 to the Commercial Credit Corporation as a privileged creditor, and amended to deduct therefrom the mortgage creditor's proportionate share of the expenses for the administration in receivership.
(7) Affirmed insofar as it approves the payment of $25,000 to the Cottrell Company as a privileged creditor, and amended to deduct therefrom the mortgage creditor's proportionate share of the expenses for the administration of the receivership
(8) Reversed insofar as it deducted the sum of $6,749.71 from the amount due by the insolvent corporation to the Whitney National Bank, and it is now ordered that the total claim of the Whitney National Bank be approved in the amount of $158,096.10, as initially set forth in the provisional account.
It is ordered that the provisional account be recomputed to deduct expenses of administration where ordered, to include the liquidated claims of pre-receivership creditors heretofore excluded, and to recompute the available pro-rata distribution of funds to common creditors, all in conformity with the reasons set forth in this opinion.
Affirmed in part, amended in part, reversed in part, set aside in part and remanded in part.
NOTES
[1] "Lessor shall have the right to cancel and terminate this lease, as well as all of the right, title and interest of Lessee hereunder, by giving to Lessee not less than fifteen (15) days' notice of such cancellation and termination, and upon the expiration of the time fixed in such notice this lease and the term hereof, as well as all of the right, title and interest of the Lessee hereunder, shall expire in the same manner and with the same force and effect, except as to Lessee's liability, as if the expiration of the time fixed in such notice of cancellation and termination were the end of the term herein originally leased."
[2] 13 La.App. 222, 127 So. 47.
[3] La.App., 46 So.2d 156.
[4] United Electric Securities Co. v. Louisiana Electric Light Co., 71 F. 615 (C.C. La.).
[5] 82 F.2d 9 (C.C.A.8 Cir.).
[6] In re Mallow Hotel Corp., 17 F.Supp. 872 (D.C.M.D.Pa.).
[7] North Kansas City Bridge and R. Co. v. Leness, 82 F.2d 9 (C.C.A.9th Cir.).
[8] Landon v. Public Utilities Commission of Kansas, 245 F. 950 (D.C.Kan.).
[9] 156 La. 171, 100 So. 295.
[10] See J. D. Connell Iron Works Co., 138 La. 702, 70 So. 617; Baton Rouge Rice Mills, Inc. v. Fairbanks Morse & Co., Inc., 164 La. 729, 114 So. 633; Vickers v. Hughes, La.App., 160 So. 154.
[11] See Forrey v. Strange, 158 La. 941, 105 So. 21; Sundberry v. Bertie Sugar Co., 145 La. 700, 82 So. 857.
[12] See C. T. Patterson Co. v. Port Barre Lumber Co., 136 La. 60, 66 So. 418: International Harvester Co. v. Shreveport Nu-Grape Bottling Co., Inc., 13 La.App. 222, 127 So. 47.
[13] 135 La. 970, 66 So. 315.
[14] 150 La. 405, 90 So. 741, at 747. See also Smith v. Bank of Robeline, La.App., 142 So. 294, 295 and Consumers Oil Co. v. Perry Transfer & Storage, La.App., 162 So. 468, 469.
[15] See Board of Health, etc. v. Teutonia Bank & Trust Co., 137 La. 422, 63 So. 748.